# In the United States Court of Appeals for the First Circuit

TRINA WILKINS; JAMES BISHOP; LISA BISHOP; AMBER BRITTON;
TONI CORDOVA; JOHN CORTINA; JILL CORTINA; GEORGE DEMKO;
DOVAN HELTON; MARY HELTON; NATE BROOKS; SYDNEY JOHNSON;
PLAINTIFF D.J.; DAMON LAFORCE; MICHAEL MASULA; ERIN MASULA;
JAMES MATTHEWS; THOMAS OLSZEWSKI; DARLENE COOKINGHAM;
THOMAS STANZIANO; WENDY STANZIANO; EDDIE VIERS, individually as
surviving spouse of Teresa Viers, deceased, AND as Personal Representative of the
ESTATE OF TERESA VIERS; WILLIAM MCNEW; JEANNE WALLACE
individually as surviving spouse of Joseph Wallace, deceased, AND as
Personal Representative of the ESTATE OF JOSEPH WALLACE;
JAMES WALLACE; and SAMUEL WALLACE,
*Plaintiffs-Appellants*,
v.
GENZYME CORPORATION,
*Defendant-Appellee*
SANOFI-AVENTIS, SA; SANOFI-AVENTIS U.S., LLC,
*Defendants*.

**Appeal**
**District Court of Massachusetts**

**BRIEF OF APPELLANTS WILKINS ET AL.**

C. ALLEN BLACK, JR.
LAW OFFICE OF C. ALLEN BLACK, JR.
322 North Shore Dr.
Bldg. 1b, Ste. 200
Pittsburgh, PA 15212
(412) 908-3268

JONATHAN M. GESK
GESK MORITZ, LLC
14 East Main Street
Carnegie, PA 15106
(412) 429-9100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD........................... ix

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................. 3

I.     BACKGROUND OF THE PRESENT LITIGATION .................................. 3

    A.    Substantive Allegations ........................................................ 3

    B.    Procedural History .............................................................. 5

    C.    Order Under Appeal ............................................................ 6

SUMMARY OF THE ARGUMENT ....................................................... 7

ARGUMENT ................................................................................. 8

I.     STANDARDS OF REVIEW ............................................................ 8

    A.    Lack of Standing Dismissal .................................................. 8

    B.    Rule 12(b)(6) Dismissal ....................................................... 9

    C.    Rule 9(b) Dismissal ............................................................ 10

II.    LEGAL ARGUMENT ................................................................. 10

    A.    Introduction ..................................................................... 10

    B.    Standing .......................................................................... 16

        1.    There is a difference between pleading an injury in fact versus medical injury causation ...................................... 16

        2.    The lower court erroneously substitutes its medical judgment for that of medical experts by framing medical causation damages as "implausible" for standing purposes ................................................... 20

3.      Plaintiffs' economic loss claims clearly set forth that by paying for a medication that had zero utility (yet did pose risks of harm), the Plaintiffs were deprived medical benefit and should be compensated for all monies paid to Genzyme ........................................................ 24

C.   Rule 12(b)(6) medical damages for sensitization after "low doses" treatment ................................................................. 26

1.      The lower court misapplies the learned intermediary doctrine ................................................................... 26

2.      The lower court misconstrues what constitutes a design defect and a manufacturing defect for sensitization ............................................................. 29

3.      The lower court fails to grant the proper credibility to the Plaintiffs' allegation of acceleration of disease. ................................................................ 31

4.      The lower court erred in its analysis of express and implied breach of warranty. ..................................... 34

5.      The lower court incorrectly invokes Rule 12(b)(6) to dismiss the case on the merits for a failure to pin cite a statute for negligence per se. ......................... 35

6.      The lower court erred by failing to certify the question of the fiduciary role of a drug company when the company substitutes its medical judgment for that of a state licensed treating physician .......................... 36

7.      The lower court erred in ignoring the materiality of Genzyme's self-described knowledge that "low dose" is based on "bullshit data" and those taking it would be "insane" for Plaintiffs' fraud/fraudulent concealment claims. ................................................ 41

8.      The lower court misapplies the equity doctrine of unjust enrichment. The economic value of a pharmaceutical drug is measured by its medical value, not its mass weight. ..................................... 43

ii

9.      The class is improperly dismissed as to the numerosity, as it likely contains at least 75 members ................................................................. 45

10.     The lower court erred in dismissing Ms. Wilkins' claims to negligence per se, fraud/fraudulent concealment and breach of fiduciary on the merits without providing a reasoned analysis. .................................... 46

CONCLUSION ................................................................................. 46

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ..................................... 48

CERTIFICATE OF SERVICE .............................................................. 49

# TABLE OF AUTHORITIES

## Cases

*Adamo v. Genzyme Corp.*,
    No. 13-11336 (D. Mass) ...................................................................... 5, 5, 45

*Ala. Power Co. v. Ickes*,
    302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938) ...................................... 12

*Ala. v. Chesser*,
5 So. 3d 715 (Fla. Dist. Ct. App. 2009) .................................................. 48

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 13

*Bank of Montreal v. Signet Bank*,
193 F.3d. 818 (4th Cir. 1999) .................................................................... 48

*BCS Servs.*,
    637 F.3d at 757 ........................................................................................ 26

*Beale v. Biomet, Inc.*,
    492 F. Supp. 2d 1360 (S.D. Fla. 2007) ...................................................... 32

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, (2007) .................................................................................. 9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................ 12

*Boardman v. United Servs. Auto Ass'n*,
    742 F.2d 847 (5th Cir. 1984) .................................................................... 42

*Carlson v. Chisholm–Moore Hoist Corp.*,
    281 F.2d 766 (2d Cir.1960) ...................................................................... 12

*Centro Medico del Turabo, Inc. v. Feliciano de Melecio*,
    406 F.3d 1 (1st Cir. 2005) ........................................................................ 13

*Fantini v. Salem State College*,
    557 F.3d 22 (1st Cir. 2009) ...................................................................... 13

*Gagliardi v. Sullivan*,
    513 F.3d 301 (1st Cir. 2008) .................................................................... 13

*Garside v. Osco Drug, Inc.*,
    976 F.2d 77 (1st Cir. 1992) ...................................................................... 32

iv

*Higgins v. Forest Lab'ys*,
    48 F. Supp. 3d 878 (W.D. Va. 2014) ............................................................ 31

*Hochendoner v. Genzyme Corp.*,
    95 F. Supp. 3d 15 (W.D. Mass. 2015) .......................................................... 6

*Hochendoner v. Genzyme Corp.*,
    No. 11-10739 (D. Mass) ................................................................................ 5

*Hochendoner v. Genzyme Corp.*,
    No. 15-1446, 823 F.3d 724 (1st Cir. 2016) ........................................ *passim*

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ......................................................................... 22

*In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ...................................................... 24

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
    712 F.3d 21 (1st Cir. 2013) ................................................................ *passim*

*In re Neurontin Mktg., Sales Practices, & Prod. Liab. Litig.*,
    612 F. Supp. 2d 116 (D. Mass. 2009) ........................................................ 18

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
    No. MDL 13-2419-FDS, 2013 WL 6058483 (D. Mass. Nov. 13, 2013) ...... 30

*In re Rezulin Prods. Liab. Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005) ........................................................ 24

*In re Zofran (Ondansetron) Prod. Liab. Litig.*,
    423 F. Supp. 3d 1 (D. Mass. 2019) ....................................................... 24, 25

*In re: Celexa and Lexapro Marketing and Sales Prac. Litigation*,
    779 F. 3d 34 (1st Cir. 2015) ....................................................................... 13

*Jacobson v. Commonwealth of Massachusetts*,
    197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905) ..................................... 41

*Johnson v. City of Shelby, Miss.*,
    574 U.S. 10 (2014) ............................................................................... 39, 40

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ................................................................... 12, 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................... 12, 13, 14

*McCuin v. Secretary of Health & Human Servs.*,
    817 F.2d 161 (1st Cir.1987) ....................................................................... 50

*Milward v. Rust-Oleum Corp.*,
820 F.3d 469 (1st Cir. 2016) ........................................................ 24

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) ...................................................................... 33

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011) ................................................ 13, 14, 37

*Pagán v. Calderón*,
448 F.3d 16 (1st Cir.2006) .............................................................. 8

*Perez v. Wyeth Laboratories, Inc.*,
161 N.J. 1, 734 A.2d 1245 (1999) ................................................ 32

*Plant v. Merrifield Town Ctr. Ltd. P'ship*,
711 F. Supp. 2d 576 (E.D. Va. 2010) .......................................... 48

*Platten v. HG Bermuda Exempted Ltd.*,
437 F.3d 118 (1st Cir. 2006) ........................................................ 13

*Plourde v. Sorin Grp. USA, Inc.*,
23 F.4th 29 (1st Cir. 2022) ........................................................... 42

*Reckis v. Johnson & Johnson*,
471 Mass. 272, 28 N.E.3d 445 (2015) .......................................... 24

*Schubert v. Genzyme Corp.*,
2013 WL 4776286 (D. Utah Sept. 4, 2013) ...................... 42, 43, 51

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
71 F.3d 119 (4th Cir. 1995) .......................................................... 46

*Thames Shipyard & Repair Co. v. United States*,
350 F.3d 247 (1st Cir. 2003) ........................................................ 13

*Thorson v. Mandell*,
402 Mass. 744, 525 N.E.2d 375 (1988)
No. CV 22-10072-WGY, 2022 WL 16857262
(D. Mass. Nov. 10, 2022) .............................................................. 43

*Wyeth v. Levine*,
555 U.S. 555 (2009) ............................................................. *passim*

## Constitutional Provisions

U.S. Const. Amend. X ................................................................... 34

## Statutes

21 U.S.C. § 355(b)(1)(F) ............................................................... 33

21 U.S.C. § 355(d) ....................................................................... 33

28 U.S.C. § 1291 ............................................................................ 4

28 U.S.C. §§ 1332(d)(2) and (6) ................................................... 4

Fla. Stat. § 499.007(6)(b) ............................................................ 40

IN Code § 16-42-3-4(6)(b) .......................................................... 36

Ky. Rev. Stat. § 217.065 6(b) ...................................................... 40

VA Code § 54.1-3462 ................................................................... 40

## Rules

Fed. R. Civ. P. 8(e) ..................................................................... 20

Fed. R. Civ. P. 9(b) ..................................................................... 10

Fed. R. Civ. P. 12(b)(6) ........................................................ *passim*

## Regulations

21 C.F.R. § 314.50(c)(2)(i) ......................................................... 33

21 C.F.R. § 314.50(d)(5)(viii) ..................................................... 33

21 C.F.R. § 314.50(c)(2)(ix) ....................................................... 27

Pa. 35 § 780-108 ........................................................................ 27

Pa. 64 § 13 ................................................................................. 27

## Other Authorities

John B. Wong, et al.,
*Reference Guide on Medical Testimony*,
in Reference Manual on Scientific Evidence 687
(Fed. Judicial Ctr. 3d ed. 2011) ................................................. 20

John R. Brown,
*Certification – Federalism in Action*,
7 Cumb. L. Rev. 455 (1977) ....................................................... 38

Mary Sue Henifin, et al.,
  *Reference Guide on Medical Testimony*,
  *in* Reference Manual on Scientific Evidence 439
  (Fed. Judicial Ctr. 2d ed. 2000) ...................................... 20

Merriam-Webster Dictionary p.1164 (3d ed. 2002) ............................... 17

Oxford English Dictionary, 163419, (3d ed. 2010) ............................... 12

Restatement (First) of Restitution § 16 (1937) ........................................ 48

Restatement (First) of Restitution § 28 (1937) ........................................ 48

Restatement (First) of Restitution § 70 (1937) ........................................ 47

Restatement (Second) of Torts Restatement Topic 8.  Prevention of
  Assistance by Third Persons. Scope Note (1965) ......................... 13

Restatement (Second) of Torts § 326 ........................................... 17

Restatement (Second) of Torts § 327 ........................................... 17

Restatement (Second) of Torts § 402 A ......................................... 43

Restatement (Second) of Torts § 551(2)(e) ..................................... 47

Unguru Y, et al.,
  J Natl Cancer Inst. 2016 Jan 29; 108(6) .................................... 46

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

A central issue in this case is the specificity of medical causation pleading that is required under Rule 12(b)(6) and standing doctrine. To understand the complexities of Fabry disease, its medical treatment, and the effects of drug contamination and improper enzyme replacement therapy on human biology, oral argument will be helpful to this Court for understanding the underlying scientific issues of "medical plausibility" under either standing doctrine or Rule 12(b)(6).

## JURISDICTIONAL STATEMENT

The District Court had diversity jurisdiction under 28 U.S.C. §§ 1332(d)(2) and (6) because one or more members of the classes are citizens of a State different from Genzyme Corporation and the aggregate amount in controversy exceeds five million dollars ($5,000,000).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. By Memorandum and Order dated September 14, 2022, the District Court granted Genzyme Corporation's Motion to Dismiss. The Plaintiffs timely filed a Notice of Appeal on October 13, 2022. This appeal is from a final order that disposed of all the Plaintiffs' claims.

**STATEMENT OF THE ISSUES**

1.     Whether the lower court misapplied standing doctrine by classifying the Plaintiffs according to their medical damages instead of classifying the invasions to a legally protected interest in a safe and effective injectable drug?

2.     Whether Plaintiffs have adequately stated a claim for negligence and breach of fiduciary under Rule 12(b)(6) where the Plaintiffs were sensitized to Fabrazyme by off-label "low dose" treatment?

3.     Whether the Plaintiffs have stated a claim for fraud/fraudulent concealment under Rule 9(b) for failing to disclose material information on "low dose?"

4.     Whether failure to pin cite negligence per se statute is a Rule 12(b)(6) issue or Rule 8 issue pin citing to the State statute outlawing the conduct of the Defendants under a negligence per se claim?

5.     Whether the Plaintiffs are sufficiently numerous to warrant a class action certification?

**STATEMENT OF THE CASE**

## I. BACKGROUND OF THE PRESENT LITIGATION

### A. Substantive Allegations

The Plaintiffs suffer from Fabry disease, a life-threatening illness. While no cure is available, enzyme replacement therapy effectively treats Fabry disease. Fabrazyme, a drug manufactured by Genzyme Corporation, is the only such drug approved in the United States. App.42:31-33. Genzyme also sells Fabrazyme outside of the United States. App.53:97-98. The Food and Drug Administration's ("FDA") 2003 approval of Fabrazyme was based on a specific recommended and prescribed dosage of 1mg/kg administered every two weeks. App.42:91. The drug costs over $600,000 per year per patient. App.27:41.

Genzyme caused a shortage of Fabrazyme by contaminating its bioreactors. App.27:42. To address the shortage, Genzyme created a plan to serially allocate less than full doses ("low doses") to the Fabry patients in the United States and allocate full doses to those Fabry patients outside of the United States. App.72:190. The basis for this allocation plan was the market value of each country's Fabry patients, not the severity of each patient's disease or medical need for the drug. App.73:195. Specifically, a competing drug ("Replagal") was available in Europe and Australia. Genzyme was concerned that Fabry patients would switch to the competing drug if

these patients were not provided full doses during the shortage. App.78:216. In contrast, United States patients did not have a readily available alternative, so Genzyme was not concerned about losing its customers if Genzyme were to provide "low doses" to patients in the United States. *Id*. at 217.

The market allocation plan was only the starting point of Genzyme's wrongful conduct. While Genzyme was sending "low doses" to U.S. patients, it knew but did not disclose that "low doses" do not treat Fabry disease. To be clear, it's not that "low doses" are proportionally less effective than full doses; it's that they provide zero benefit. Internal documents characterized the "low dose" theory of treatment as based on "bullshit data." App.101:339. Genzyme also warned Australian medical authorities that reducing dose "to 0.2 mg/kg [low dose] . . . across the board **would have significant clinical consequences for patients, with the expectation that many would suffer irreversible harm as a result of insufficient dosing**," and that "**treatment at a higher dose is necessary and may be life-saving**." In the same communication, Genzyme stated that the suggestion to "reduce the dose of Fabrazyme® to 0.2 mg/kg in all patients ignores the cumulative evidence in the extant literature" and that to believe such a reduction could occur "with little or no loss of efficacy is conjectural." App.96:308. In a related email, senior management stated that such a "**blanket dose adjustment would be insane**." *Id.* at 310. Genzyme continued, however, to sell these worthless doses to United States Fabry

patients and never disclosed to them that the medication would not provide any medical benefit.

Genzyme continually misrepresented to the Fabry patients that the shortage would end quickly, but it knew that the production of full doses was not happening anytime soon. App.94:308. In fact, the shortage lasted for 2.5 years. These misrepresentations – that "low doses" were medically effective and that the shortage was ending soon – had the perilous effect of discouraging Plaintiffs from seeking out alternative treatments while believing that "low dose" to be of some medical benefit in staving off Fabry disease. App.78:296.

Plaintiffs commenced this litigation asserting that they and others similarly situated suffered harm as a result of the contaminated and "low dose" of Fabrazyme due to Genzyme's wrongful conduct of introducing it into commerce. The Second Amended Complaint ("SAC") alleged claims for negligence, statutory and common law product liability, violations of state consumer protection laws, breach of fiduciary, fraud/fraudulent concealment, and loss of consortium, among others. App. 17-166.

## B. Procedural History

This litigation is a continuation of *Adamo v. Genzyme Corp.*, No. 13-11336 (D. Mass), and *Hochendoner v. Genzyme Corp.*, No. 11-10739 (D. Mass), which was

consolidated and heard by this Court as *Hochendoner v. Genzyme Corp.* No. 15-1446., 823 F.3d 724, 730 (1st Cir. 2016).

After their cases were dismissed as to standing by the First Circuit in *Hochendoner*, the Plaintiffs and Genzyme engaged in settlement negotiations. During this time, the parties also signed a tolling agreement so that the case did not need to be refiled while the negotiations were continuing. Of the 80+ Plaintiffs in *Hochendoner*, the remaining Plaintiffs in this action were not able to settle, so these cases were refiled as *Wilkins et al. v. Genzyme* in the Southern District of Indiana No: 4:20–cv–00051, which transferred the case under the federal venue provision to District of Massachusetts under the same judge as *Hochendoner* and *Adamo*. *Hochendoner v. Genzyme Corp.*, 95 F. Supp. 3d 15 (W.D. Mass. 2015).

### C.    Order Under Appeal

By Memorandum and Order dated September 14, 2022, the District Court granted Genzyme's Motion to Dismiss for lack of standing and failure to state a claim. Add.1-83. The lower court also dismissed with prejudice the claims asserted by Mr. LaForce, Mr. Stanziano, Ms. Stanziano, and Ms. Wilkins due to sensitization to Fabrazyme from serial "low dosing."

## SUMMARY OF THE ARGUMENT

The Plaintiffs' SAC complied with all applicable threshold pleading standards. However, the District Court misapplied the pleading standards. It erred in three respects to standing 1) by confusing an injury with an injury in fact, 2) by substituting its own lay judgment on medical causation for that of experts, and 3) it ignored the pecuniary damages that would naturally flow from being sold an ineffective and dangerous drug.

The lower court also erred in ten respects to pleading "sensitization" claims under Rule 12(b)(6). 1) It misapplied the learned intermediary doctrine to causation; 2) it misconstrued the difference between a manufacturing defect and a design defect; 3) it failed to give the Plaintiffs' description of their own symptoms and timing of symptoms proper credibility; 4) it erred in analyzing the "value" of an ineffective drug dose under breach of express or implied warranty; 5) it incorrectly invokes Rule 12(b)(6) to dismiss the case on the merits for a failure to pin cite a statute for negligence per se; 6) it failed to certify the question of fiduciary duty when undertaking a public health measure to the state courts; 7) it erred in ignoring the materiality of Genzyme's self-described knowledge that the "low dose" is based on "bullshit data" and anyone would be "insane" to take it; 8) it erred in applying the doctrine of unjust enrichment based on material facts for the danger and ineffectiveness of "low dose" Fabrazyme not being disclosed; 9) it erred in

calculating numerosity of the class of patients that were sensitized to "low dose" Fabrazyme, and 10) it erred by dismissing Ms. Wilkins' negligence per se, breach of fiduciary claims, and fraud/fraudulent concealment claims under Rule 12(b)(6) on the merits without providing any reasoning for the dismissal.

## ARGUMENT

## I.     STANDARDS OF REVIEW

### A.     Lack of Standing Dismissal

Appellate review for standing is de novo. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016).

> The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts. *Pagán v. Calderón*, 448 F.3d 16, 26 (1st Cir.2006); *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012).

> To satisfy the personal stake requirement, a plaintiff must establish each part of a familiar triad: injury [in fact], causation, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561; *see Bennett v. Spear*, 520 U.S. 154, 167–68 (1997); *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012).

> The invasion of a common-law right (including a right conferred by contract) can constitute an injury sufficient to create standing. *See Ala. Power Co. v. Ickes*, 302 U.S. 464, 479, 58 S.Ct. 300, 82 L.Ed. 374 (1938). *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012).

## B.    Rule 12(b)(6) Dismissal

A Court of Appeals reviews <u>de novo</u> a District Court's dismissal for failure to

state a claim. *In re: Celexa and Lexapro Marketing and Sales Prac. Litigation*, 779

F. 3d 34, 39 (1st Cir. 2015).

> This Court should "affirm the dismissal of the complaint if, and only if, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of Appellant, the complaint 'fails to state a claim upon which relief can be granted.'" *Fantini v. Salem State College*, 557 F.3d 22, 26 (1st Cir. 2009) (quoting Fed. R. Civ. P. 12(b)(6)).

> To the extent that the District Court's failure to grant Appellants leave to amend is deemed a denial of leave to amend, such a decision is reviewed for abuse of discretion. *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 131 (1st Cir. 2006).

> On a motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement. . ..'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

> "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint. *Ocasio-Hernandez v. Fortuno-Burse*t, 640 F.3d 1, 13 (1st Cir. 2011).

As we have said previously, "[a] plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." *Id*. at 15 (1st Cir. 2011).

### C.    Rule 9(b) Dismissal

Under Rule 9(b), the standard for allegations of fraud is higher than the normal pleading standard. To survive a motion to dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

## II.    LEGAL ARGUMENT

### A.    Introduction

The defects in the original *Adamo* and *Hochendoner* complaints were remedied in the Plaintiffs' Second Amended Complaint in *Wilkins*. Each form of damage and injury incurred by each Plaintiff is stated with specificity. The lower court opined that, except for three Plaintiffs' sensitization damages (and one loss of consortium claim), all Plaintiffs lack standing.

The standing analysis by the lower court is legally incorrect and factually inaccurate. Under a standing analysis, a plaintiff does not need to show medical causation in order to establish "plausible causation." A plaintiff must only show the invasion of a legally protected interest. In the alternative, Plaintiffs in the present case have properly averred specific damages caused by Genzyme's conduct. Any further scrutiny of their alleged damages should be undertaken after expert reports have been secured.

The medical damages that naturally flow from Genzyme marketing and selling Fabrazyme at a dose that was ineffective and/or in a condition that was unsafe are properly alleged with particularity. The SAC avers the specific medical injuries incurred by each Plaintiff as a result of "low doses" and/or contaminated Fabrazyme. Further, each Plaintiff clearly sustained economic injury because they paid for Fabrazyme, which had zero efficacy and no valid medical use. The lower court instead works backward by scrutinizing the expert support for the list of medical damages (which it terms "harms" instead of the correct term "damages") to determine that no legally cognizable interests were invaded in the first place.[1] This bottom-up approach eliminates the policy purpose of allowing product liability cases for pharmaceutical drugs where post marketing "safety risks" medical cases are pled. *See*, *Wyeth v. Levine*, 555 U.S. 555, 578–79 (2009)("State tort suits uncover _unknown_ drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may _motivate injured persons to come forward with information_.") [2]

---

[1] "[A]n injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)

[2] "In keeping with Congress' decision not to pre-empt common-law tort suits [for prescription drugs], it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market,[11] and manufacturers have superior access to

Underlying the decision in *Wyeth* is that all clinical interventions are rescues at their heart—the defining feature being that medical aid is given for the benefit of the injured or sick person.[3] Purposefully substituting an ineffective drug for an effective one is tortious conduct because it renders medical intervention useless.[4] During a drug shortage, it also wastes precious drug, notwithstanding the fact that patients suffer severe side-effects with no clinical benefit from the injection.

This Court has found that there is no benefit to selling ineffective drugs to sick patients and that payors were entitled to recover their money back due to it being ineffective:

> "Where, as here, numerous . . . [sources] indicate that a drug is ineffective, that provides powerful scientific evidence of inefficacy, particularly as compared to anecdotal experiences, which can be tainted by the placebo effect. As one witness in this trial testified, "the

---

information about their drugs, especially in the postmarketing phase as new risks emerge…. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation." *Wyeth v. Levine*, 555 U.S. 555, 578–79, 129 S. Ct. 1187, 1202, 173 L. Ed. 2d 51 (2009).

3    The Oxford English Dictionary, 163419, (3d ed. 2010) "Rescue" (2)(a): To deliver or save (a person or thing) from some evil or harm.

4 The lower court states that "the complaint does not show that low dose Fabrazyme 'makes it impossible to treat Fabry disease.'" Add. 071. However, the SAC points out that full doses were banned in the U.S. App.105:351(h). The substitution of ineffective doses coupled with banning treating physicians from administering the standard of care full doses is why treating the disease became impossible. In any event, the standard of care for "impossible to treat" is an expert one for medical treatment, so the case should proceed to discovery.

default position [in medical decisionmaking] is that a drug is ineffective unless it's proven otherwise." Experiments start with a null hypothesis that the drug is no more effective than placebo. In this case, . . . [sources] repeatedly showed that there was not enough evidence to reject the null hypothesis for the indications at issue. *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 49 (1st Cir. 2013).

The SAC also states that Genzyme barred the treating physicians from using full dose treatment. App.105:351(h). The purposeful interference with a medical rescue allows the Plaintiffs to recover "but-for" damages. Specifically, Genzyme "is subject to liability for physical harm caused to the other by the absence of aid which he has prevented the third person for giving." Restatement (Second) Torts § 326, § 327, Intentionally/ Negligently Preventing Assistance.[5] This duty of non-interference with a medical rescue was breached when the drug company targeted the Plaintiffs for substitutions of an ineffective dosage schedule contrary to the physicians' recommendation whether there was a shortage or not. App. 72:191.[6] The

---

[5]    "The actor can prevent a third person from rendering aid to another in many ways… including by interfering with his efforts to give aid; third, by injuring or destroying the usefulness of a thing which the third person is using to give aid or by otherwise preventing him from using it; fourth, by obstructing the third person's access to the other."

Restatement (Second) of Torts, Topic 8. Prevention of Assistance by Third Persons. Scope Note (1965)

[6]    *See* for example, *Thames Shipyard & Repair Co. v. United States*.

"[w]e think the evidence, viewed in the light most favorable to appellants, was such that a reasonable fact-finder could conclude that the Coast Guard

Plaintiffs foreseeably suffered the brunt of the harm from Genzyme's market allocation decision.

The SAC correctly states the theory for a duty, a breach of duty, and direct (not attenuated) causation between Genzyme selling the unsafe and ineffective drug to these Plaintiffs, their specific damages, and the ongoing misleading communications to the Plaintiffs from Genzyme. App.86:252, 292, 444. The medical damages are within the scope of those that would naturally flow from introducing an unsafe and ineffective drug into commerce in that it was sold at "low dose" and sold with particulates and vesivirus contamination. App.56:110. And, with respect to the Plaintiffs' economic loss claim, the lower court glosses over the claim and mistakenly concludes that "Plaintiffs spent money on a medication that they knew would come in a lesser quantity than what they usually purchased[]" when the actual claim is that the lesser quantity had zero effect on treating Fabry disease as opposed to just a lessened effect. Add.55.

The First Circuit recognized in *In re Neurontin* that marketing an ineffective drug is tortious conduct allowing economic recovery for those who paid for it. "Kaiser's damages theory was based on Neurontin's complete *ineffectiveness* for off-

---

had reason to know that a third party was ready to give aid of a potentially useful type that the Coast Guard could not provide, and that it negligently engaged in actions that tended to prevent or disable such person from giving such aid." 350 F.3d 247, 266 (1st Cir. 2003).

label uses. . .. The jury rejected Pfizer's arguments [that it was marginally effective] and awarded Kaiser $47,363,092 in damages, which the court trebled to $142,089,276." *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 33 (1st Cir. 2013)("This fraudulent marketing [of Neurontin] included, but was not limited to, three strategies, each of which included subcomponents: (1) direct marketing (or "detailing") to doctors, which misrepresented Neurontin's effectiveness for off-label indications; (2) sponsoring misleading informational supplements and (3) suppressing negative information about Neurontin while publishing articles in medical journals that reported positive information about Neurontin's off-label effectiveness"). *Id*. at 28. Genzyme's conduct maps onto the illegal marketing tactics that Pfizer used in *In Re Neurontin*. It directly contacted doctors through the Fabry Stakeholders Working Group. App.79:221. And Genzyme cited the "bullshit data" from the Lubanda study while suppressing the more clinically relevant Vedder study in these communications. App.83:242 and 155:448.

The Plaintiffs present compelling evidence that "low dose" off-label Fabrazyme is ineffective for treating Fabry disease. The "low dose" was not just "sub-optimal" as the lower court characterizes it. Add.32. FN 14. ("[I]t would have been obvious that the lower dose was sub-optimal." *Cf.* App.55:106 (As a result of "low-dosing," Genzyme Corporation had eliminated the therapeutic window for treating Fabry disease with Fabrazyme (lacking therapeutic effect while enhancing

the likelihood of known side-effects) – notwithstanding the fact that the Fabrazyme was adulterated with vesivirus and glass, rubber, and steel particles as well. It is an understatement that such medical information about the effectiveness of 'low dose' Fabrazyme was material for treating Plaintiffs' Fabry disease.")

## B. Standing

### 1. There is a difference between pleading an injury-in-fact versus medical injury causation.

The lower court dismissed Plaintiffs' acceleration and vesivirus damages on the basis that the SAC failed to establish a causal connection between the alleged conduct of Genzyme (selling adulterated drug at an unapproved dosage) and the damages sustained by the Plaintiffs from buying it. Add.52-56. As part of this analysis, the lower court cites the standing requirement of "injury in fact," but it misinterprets the definition.

It uses the lay definition of "injury," *i.e.*, physically injurious, which is different than the broader term "injury-in-fact," *i.e.*, invasion of a legally protected interest. All the Plaintiffs' physical injuries naturally flow from the invasion of their legal interest in having a safe and effective drug by being sold an ineffective and unsafe medical drug. The allegations are a "plausible" result of Genzyme's misconduct that invaded their legal interests.

A legally protectable interest is an interest that derives from a legal right. "The invasion of a common-law right (including a right conferred by contract) can

constitute an <u>injury</u> sufficient to create standing." *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012); *see also* Merriam-Webster recognizing the difference in the English language between a physical "injury" and a legally cognizable "injury." [7] The right to a safe and effective drug is codified under the various States' drug laws prohibiting misbranded and adulterated drugs being introduced into commerce, in addition to the requirement for FDA testing and approval of the dosage after human clinical trials have determined effectiveness.

Plaintiffs adequately pled a right to an unadulterated and effective dose of Fabrazyme under state product liability law and that Genzyme violated this right by sending them (1) "low dose" Fabrazyme instead of the full effective dose; and (2) contaminated Fabrazyme. "Low doses" were not a result of a stock out. Genzyme serially sent Plaintiffs "low doses" for two-and-one-half years at the same time it was purposefully sending full doses to Europeans with no regard to medical need. Indeed, the sale of "low dose" drug was part of a marketing and allocation scheme that is deemed criminal activity at both the Federal and State level for off-label

---

[7]    Merriam-Webster Dictionary (3d ed. 2002) p. 1164:  " injury"

1: hurt, damage, or loss sustained [versus]

2    a: WRONG,  b: violation of another's rights for which the law allows an action to recover damages

marketing. These behaviors are proscribed by law to protect American citizens' health and safety, including the Plaintiffs'.

The injuries are concrete and particularized because the invasion of the right to an effective and safe dosage caused these Plaintiffs the five species of physical damages (ineffective treatment, acceleration, sensitization, particulate injuries, and vesivirus injuries), economic injury (paying for drugs that have no efficacy) and informational injury (failure to warn). These are all plausible injuries that can exist either alone or in combination. Plaintiffs' specific medical damages are listed in their synopses App.19-40:1-24, along with one form of pecuniary injury (paying for medically worthless Fabrazyme) and one form of informational injury (failure to disclose medical risks and lack of medical benefit to which they had a right).

This Court has repeatedly recognized overpayment as a cognizable form of Article III injury. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018) (recognizing "injury in the form of lost money fairly traceable to an allegedly unlawful supra-competitive price (recognizing "overpayment [as] a cognizable form of injury"); see also, *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 712 F.3d 21, 35 (1st Cir. 2022). As in *Evenflo,* Genzyme knew that "the loss of favorable marketing claims [to safety and effectiveness] would make a product less marketable…." *Id.*at 40.

While the "low dose" substitution occurs on the background of a drug shortage, it is not a "failure to supply the market." It is an affirmative choice on market allocation during a shortage. In a medical context, drug allocation is triage. In other words, the act of allocating full doses to some but "low doses" to others, created the same duty of care that a hospital or physician would in any triage situation. The key being that full dose therapy would have been effective for the Plaintiffs. The market allocation plan necessarily endangered one group of individuals in favor of others, thereby interfering with a rescue.

As to the damages for purposefully selling an ineffective drug dose during a drug shortage, interference with the rendering of medical aid entitles Plaintiffs to but-for damages. These injuries are not "natural progression" claims that the First Circuit addressed in *Hochendoner*.[8] "Low doses" are wasted doses. The worst possible allocation system during a shortage is to use the drug for ineffective "low dosing" because it serves no legitimate medical purpose. As the ones harmed by Genzyme's decision to allocate ineffective doses of drug during a drug shortage, the Plaintiffs properly have standing under Article III.

---

[8] Plaintiffs properly plead interference with their savior and "but-for" damages, not "natural progression." App. 106:351(h)

2. **The lower court erroneously substitutes its medical judgment for that of medical experts by framing medical causation damages as "implausible" for standing purposes.**

Medical causation (both general and specific) is an issue reserved for the case's discovery stage because the causation of medical damages is <u>necessarily</u> based on expert testimony. The need for medical experts does not undermine causation being adequately pled for standing doctrine or Rule 12(b)(6).

> "In order to prevail in a pharmaceutical personal injury case, a plaintiff must establish two types of causation: general and specific." *In re Neurontin Mktg., Sales Practices, & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 123 (D. Mass. 2009) (citing *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1171-72 (N.D. Cal. 2007); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 401-02 (S.D.N.Y. 2005)). "General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease. . . . Specific, or individual, causation, however, is established by demonstrating that a given exposure is the cause of an individual's disease. . . ." *Id.* (quoting Mary Sue Henifin, et al., *Reference Guide on Medical Testimony, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 444 (Fed. Judicial Ctr. 2d ed. 2000)); *see also* John B. Wong, et al., *Reference Guide on Medical Testimony*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 687, 691 (Fed. Judicial Ctr. 3d ed. 2011). It is well-established under Massachusetts law that "expert testimony is required to establish medical causation." *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 476 (1st Cir. 2016) (quoting *Reckis v. Johnson & Johnson*, 471 Mass. 272, 292, 28 N.E.3d 445 (2015)). "This applies to both general and specific causation." *Id.* (citing *Reckis*, 471 Mass. at 292 n.33, 28 N.E.3d 445).

*In re Zofran (Ondansetron) Prod. Liab. Litig.*, 423 F. Supp. 3d 1, 4 (D. Mass. 2019)

The lower court simply does not believe the facts linking the Plaintiffs' vials of Fabrazyme to the physical injuries that they allege to have suffered. The lower

court asserts that the Plaintiffs are not credible sources to report their own medical injuries. *See*, "There is no information [attached to the complaint] from a physician about [the Plaintiffs'] symptoms or a comparison with symptom progression before "defective" doses." Add:53; "Plaintiffs simply provide their say-so. . . ." Add. p.54; "No plaintiff provides . . . a vesivirus diagnosis or [molecular evidence] of the virus being detected in their body." *Id*.[9]

However, this Circuit has stated in the predecessor *Hochendoner* case that

"An individual's plausible allegations of a personal injury will generally suffice to plead an injury in fact, even if the claim is ultimately lacking on the merits." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016).

No one disputes that these particular Plaintiffs are at the right time and place (proximate) to have received an ineffective and unsafe dose of Fabrazyme or that the symptoms they plead are plausibly the effects of contaminated and "low dose" medication. The Plaintiffs even provide medical studies supporting the allegations. The ineffectiveness of "low dose" Fabrazyme is not a bare legal conclusion. The data

---

[9]  The lower court also misapplies science behind vesivirus rashes being pled for standing.  The Plaintiffs specifically state in the complaint that the rashes are "vesiculating" or blistering and were not treatable with steroids.  App. 18:1 (Wilkins), App. 19:2 (Bishop), 22:5 (Cordova), 25:8 (Demko), 26:9 (M. Helton), and 33:15 (Masula).  Therefore, the rash cannot be due to the normal side effects of Fabrazyme because infusion reaction rashes are non-blistering and treatable with steroids contrary to what the lower court contends.  Expert testimony would have revealed the court's scientific mistake in interpreting medical causation.

linking the defects to the lot number of the Plaintiffs' vials is solely in Genzyme's possession. The jurisdictional limits of standing and the gatekeeping function of Rule 12(b)(6) are not implicated when all that is left is for experts to weigh in on the allegations and production of Genzyme's lot testing.

The lower court goes on to state that "Plaintiffs' allegations repeatedly refer to 'defective' Fabrazyme without specifying whether the problem was dosage or contaminants, a failure which 'undermines' Plaintiffs' claims." Add:52. However, the "problem" was the medication, not the pleading. The drug was <u>simultaneously</u> adulterated and sold at an untested "low dose." A drug having two defects is just as injurious as selling a drug with one, especially for standing purposes. To the extent a species of medical damage is caused by one defect or the other defect, or a combination thereof, it is properly an issue for discovery. All that is required is that a defect "plausibly" contributed to the medical injury being pled. This Court has explicitly stated that:

> "A tort plaintiff need not "prove a series of negatives; he doesn't have to 'offer evidence which positively exclude[s] every other possible cause of the accident.'" *BCS Servs.*, 637 F.3d at 757 (alteration in original) (quoting *Carlson v. Chisholm–Moore Hoist Corp.*, 281 F.2d 766, 770 (2d Cir.1960) (Friendly, J.)). "Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct," the burden shifts to the defendant to rebut this causal inference. *Id.* at 758; *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 45 (1st Cir. 2013).

A decrease in life expectancy and the need to medically monitor a patient exposed to a virus and particulates are also plausible. In any event, Rule 8(e) specifically allows pleading inconsistent claims. Therefore, these claims were improperly dismissed.

Finally, "low dose" was marketed entirely off-label because it was not approved or recommended by any government authority or even the Plaintiffs' treating doctors. Accordingly, the specific Plaintiffs were the intended victims of the marketing scheme. "As Judge Posner stated . . . '[t]he doctrine of proximate cause . . . protects the ability of primary victims of wrongful conduct to obtain compensation. . ..'" *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 37 (1st Cir. 2013). The state laws prohibiting the introduction of mislabeled drugs into commerce are explicitly designed to protect the health and safety of these particular Plaintiffs.[10] These Plaintiffs have the highest possible personal stake in the litigation because they were the intended and foreseeable victims of Genzyme's conduct.

---

[10] For example, Pennsylvania Code 64 sec. 13 states prohibits

   (1) The manufacture, sale or deliver… [of a] drug, device or cosmetic that is **adulterated** or **misbranded**.

   (2) The **adulteration** or **misbranding** of any … drug.

   (3) The dissemination or publication of any false or **materially misleading** advertisement.

3. **Plaintiffs' economic loss claims clearly set forth that by paying for a medication that had zero utility (yet did pose risks of harm) the Plaintiffs were deprived medical benefit and should be compensated for all monies paid to Genzyme.**

Put simply, Genzyme's internal documents show that "low dose" Fabrazyme has zero utility for treating Fabry disease. Genzyme never communicated this to the Plaintiffs or any American treating physician. Instead, Genzyme acted as though "some" was better than "nothing" when in actuality, "some" was worse than "nothing" because some Fabrazyme was not enough to treat the disease while, at the same time, it posed risks and injured the Plaintiffs. *See* App.97:312 (All Plaintiffs who received "low doses" were led to believe that "something was better than nothing." Sarah Kulke, M.D., Medical Director, Genzyme, stated at such the Baystate Genetics and Genzyme supply update meeting on Monday, November 2nd, 2009, responding to Cheryl Sacks' question about the effectiveness of low dose, that "at least you're getting something.")

Every penny Plaintiffs paid for the Fabrazyme was an overpayment. The lower court stated that "[the Plaintiffs] only arguments to show the medication was worthless are based on conclusory statements that the doses harmed them in some

A drug is deemed **misbranded**: (6) Unless its labeling bears (i) adequate directions for use, and (ii) such adequate warnings… **against unsafe dosage** or methods or duration of administration or application in such manner and form as are necessary for the protection of users:. Pa. 35 sec. 780-108.

way." Add. 55. While, again, the efficacy of "low doses" will be the subject of expert testimony and should not be the basis for dismissal on standing, the lower court ignores the SAC's averments regarding Genzyme's suppression of the Vedder *et al*. study, showing "low dose" was medically useless. App.83:241-242 Even more explicit, Genzyme's internal documents noted that "low doses" would not "elicit[] a clinically relevant response to treatment." App.96: 309. The lower court's claim that the Plaintiffs' "only arguments to show the medication was worthless are based on conclusory statements" is flatly wrong and ignores specific factual averments in the SAC.

If the lower court found, as a matter of law, that Genzyme bore no responsibility for deceiving the Plaintiffs into receiving "low doses," as opposed to seeking alternative treatments, or if the lower court found that the Plaintiffs could not establish medical causation between the "low doses" or contaminated doses and the subsequent injuries they incurred, the Plaintiffs would still have a viable claim for paying for a drug that Genzyme sold them knowing that it would not help them. The economic loss claims are independent of any medical causation arguments and should have survived Genzyme's Motion to Dismiss. This Court has already held that a lack of effectiveness is a proper basis for economic recovery in *In re Neurontin and In Re Evenflo*, as discussed *supra*.

### C. Rule 12(b)(6) medical damages for sensitization after "low dose" treatment[11]

The lower court found that three Plaintiffs, Mr. Stanziano (FL), Mr. LaForce (VA) and Ms. Wilkins (KY/IN), have demonstrated standing for relief from their damages of sensitization to Fabrazyme from the low-dosing period, but it is unclear whether the court order is dismissing the claims as to all product defects under a Rule 12(b)(6) standard or whether the dismissal is limited to the defects that caused "low dose" sensitization. The Plaintiffs' discussion below assumes that all forms of damages were rejected under the Rule 12(b)(6) standard.

#### 1. The lower court misapplies the learned intermediary doctrine.

All three Plaintiffs were under the care of their treating physician, which the lower court believes breaks causation. Add. 62. However, the Plaintiffs also pled that their physicians could not act independently. 105:351(h). The Plaintiffs state that "the Defendant barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme in accordance with the indications of the product insert and substituting an illegal, "low dose," untested, adulterated and contaminated product that is of no known therapeutic benefit, nor as an approved equivalent for substitution of effective and pure prescription Fabrazyme." *Id*.

---

[11] The lower court correctly determines that only the Fraud/Fraudulent concealment claims are analyzed under Rule 9(b) versus Rule 12(b)6.

As such, the physicians were not causally connected to the administration of "low dose" Fabrazyme.  "Low dosing" simply was not the doctors' decision.

> "[T]he burden of proving an 'intervening cause' – something which snaps the 'causal chain' (that is, operates as a 'superseding cause,' wiping out the defendant's liability) that connects the wrongful act to the defendant's injury – is on the defendant."

*In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 45 (1st Cir. 2013)

Genzyme prevented American doctors from acting with any form of independence. Genzyme's marketing scheme of exclusive "low dose" allotment to U.S. citizens rendered treating physicians mere observers since they did not even prescribe the "low doses." Thus, the learned intermediary doctrine does not apply because Genzyme acted in such a way that the physicians' actions did not "constitute an intervening act that [broke] the chain of causation. . .." *Id.* at *14–15. *Higgins v. Forest Lab'ys*, 48 F. Supp. 3d 878, 887 (W.D. Va. 2014).

To the extent Genzyme wishes to raise the learned intermediary doctrine, it should be properly treated as a rebuttable presumption, not a failure to state a claim. The First Circuit stated that The Ohio Supreme Court explained the rebuttable presumption as follows:

> Comment j to Section 402 A (2 Restatement of Torts 2d 353) establishes a presumption that an adequate warning, if given, will be read and heeded. . ... However, where no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug. This presumption, absent the production of rebutting

evidence by the defendant, is sufficient to satisfy the first branch of the plaintiff's proximate cause burden.

*Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80–81 (1st Cir. 1992).

See also *In re Neurontin*: "Moreover, the adoption [of the defendants'] view [of the learned intermediary doctrine] would undercut the core proximate causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct.

*In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 38 (1st Cir. 2013).

Notably, an additional duty to warn is also direct to the patient because the off-label marketing included direct communications to the Plaintiffs. The lower court does not address the fact that Genzyme communicated through the Fabry Stakeholders Working Group and held phone-in "town hall" meetings with the Plaintiffs regarding their "low doses," which are considered advertisements. App.155:452).   In Florida, the court has recognized an exception to the learned intermediary doctrine in the form of a direct-to-consumer advertising exception (DTC). *Perez v. Wyeth Laboratories, Inc.*, 161 N.J. 1, 734 A.2d 1245 (1999), *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1375 (S.D. Fla. 2007). The direct-to-consumer marketing of "low dosing" weighs in favor of finding an independent duty to warn the patients as well as doctors.

## 2. The lower court misconstrues what constitutes a design defect and a manufacturing defect for sensitization.

A vial contaminated with vesivirus or particulates is a manufacturing defect that occurred during the manufacturing process. A drug administered at a dose that is not approved or tested for human use is a design defect. In a pharmaceutical drug, part of the design is the dosage medically referred to as the "posology" of the drug. The dosage is designed to balance the positive clinical effects against the risks of side effects because injecting any drug is inherently dangerous.

> A new FDA application must include "the labeling proposed to be used for such drug," 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50(c)(2)(i), and "a discussion of why the [drug's] <u>benefits exceed the risks</u> under the conditions stated in the labeling," 21 C.F.R. § 314.50(d)(5)(viii); § 314.50(c)(2)(ix). The FDA may approve an NDA only if it determines that the drug in question is "safe for use" under "the conditions of use prescribed, recommended, or <u>suggested in the proposed labeling thereof</u>." 21 U.S.C. § 355(d). In order for the FDA to consider a drug safe, the drug's "probable therapeutic benefits must outweigh its risk of harm." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 476 (2013).

As discussed *supra*, medical causation experts are needed to weigh in regarding the risk/benefit analysis of "low doses;" however, there is no reason to dismiss either the design defect or the manufacturing defects as a matter of law since they are medically plausible results from being injecting an adulterated drug at an untested "low dosed"ose. Plaintiffs should be allowed to present their scientific evidence to a jury.

Importantly, the lower court also ignored the fact that the immediate appearance of anaphylaxis occurred at the moment of full dose reinitiation. The exact timing shows a causal relationship between the prior "low doses" and the sensitization, which is strong evidence for "specific" medical causation. App.181, Add. 58:119-120 (Wilkins), App.32:14 (LaForce), and 37:20. Plaintiffs also present an accepted and medically known biological mechanism for general causation discussed *supra*. Finally, the Mooney case also "showed" sensitization upon resumption of full dose, which indicates the injury was relatively common for "low dose" patients resuming full doses (5% of the litigants, so far), which further supports general causation allegations. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 735 (1st Cir. 2016).

Moreover, for the drug product defects, it is a normal function of the courts to allow discovery for matching contaminated lot numbers to a specific patient's treatment vials. This procedure was recently done in the recent New England Compounding Pharmacy case. (Lawsuits alleging death or injury based on contaminated MPA [methylprednisolone] have been filed in multiple federal and state jurisdictions around the country, including the District of Massachusetts. *In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, No. MDL 13-2419-FDS, 2013 WL 6058483, at *1 (D. Mass. Nov. 13, 2013). The allegation that the

Plaintiffs' Fabrazyme doses were adulterated is just as credible as the allegations in the NECC case.

There is no failure in the factual sufficiency of the pleading for a medical injury of sensitization caused by "low dosing." This issue is properly a decision for the fact finder.

### 3. The lower court fails to grant the proper credibility to the Plaintiffs' allegation of acceleration of disease.

There are three reasons that the Plaintiffs' prima facie pleading should be believed.

a. The European Medicines Agency (EMA) study disclosing the risk of "low dose" acceleration should be interpreted to support the credibility of the Plaintiffs' allegations instead of being dismissed out of hand. The lower court states that "showing that acceleration can occur says nothing of whether Plaintiffs themselves suffered acceleration." Add. 53-54. In other words, the lower court points out that general causation does not prove specific causation. While true, the purpose of the pleading is to show that one is plausibly entitled to relief, not to prove the ultimate case. The proof of specific causation that the lower court requires will come at the discovery stage, where expert medical testimony will be presented. As discussed *supra*, the Plaintiffs were in the proper time and place to experience acceleration, and the scientific studies further support their allegations. That these particular Plaintiffs suffered acceleration of disease due to "low dose" Fabrazyme

treatment is perfectly plausible, and indeed expected, since the "low dosing" continued for years, unlike Europe.

b. The Plaintiffs are in the best position to know if their disease has accelerated. The Plaintiffs have Fabry disease, so they are living with the symptoms every hour of every day. They were treated with full doses of Fabrazyme and then the "low dose" Fabrazyme. Therefore, the Plaintiffs' statement of their personal medical experience on "low dose" relative to full dose Fabrazyme is direct evidence of causation, not "say-so" or hearsay. Patients (not doctors) will be the first to recognize that the drug is not providing relief and that they are experiencing symptoms faster than ever before. This is not a situation where the Plaintiffs are witnesses to the injury of another. They are entitled to be believed because they know best their own medical status and severity of their own symptoms. Acceleration of their disease is not pled as an inference but as their own personal experience on "low dose."

c. Discovery (not pleading) is the proper stage for expert opinions and production of medical records. As stated before, the EMA study was quickly discontinued to return Europeans to the full dose; however, Genzyme continued to collect data on Americans for years. These data include the Plaintiffs' data, unlike the EMA report. These U.S. data are solely in the possession of the Defendant. Without access to this data via discovery, an expert would not even be fully informed

to conclude medical causation for acceleration damages access without the incidence and prevalence data that Genzyme collected on American Fabry patients. Raising the bar for pleading medical injury causation would eliminate all pharmaceutical drug suits that plead a previously unknown form of medical injury because the causation data is not in the public domain. "A court may not insist on the allegation of "specific facts" that would be necessary to prove the claim at trial. To do so is incompatible with the notice pleading structure of the Federal Rules. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 10 (1st Cir. 2011). Similarly, this court has state that "[a] plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." *Id.* at 15 (1st Cir. 2011). Not only does the lower courts' medical certification requirement violate the "plausibility standard" of Rule 12(b)(6), it also undermines the policy purpose articulated in *Wyeth v. Levine* that encourages (not discourages) injured parties to bring such medical information on dangerous and ineffective prescription drugs to the court.

In any event, no judiciable purpose is served by not allowing the Plaintiffs to amend the pleadings to attach their medical records and expert opinions. To the extent third-party medical certification is required for any particular plaintiff to access the court system, Plaintiffs respectfully request the opportunity to amend to plead this expert evidence in support of their allegations about their own health. Such a pleading practice has been unknown in U.S. jurisprudence until the lower

court's decision in *Wilkins*. Therefore, it would be an abuse of discretion to disallow amendment so that the Plaintiffs can comply with these newly articulated pleading standards for Fabrazyme cases.

### 4. The lower court erred in its analysis of express and implied breach of warranty.

The lower court rejected these theories. "Nowhere does the package insert state that a lower dosage would be as efficacious for use in the treatment of Fabry disease as the dose recommended on the packaging and by the FDA. Nowhere does the package insert state that a lower dosage is FDA-approved." Add. 69. However, the package insert comes with the presumption that the dosage is FDA-approved with the understanding that the drug is both safe and effective. Safety and effectiveness are basic to the transaction. The fact that the drug is being marketed off-label at "low dose" does not and should not create a common law defense of *caveat emptor*. It must still be effective and safe under typical contract and quasi-contract theory. Plaintiff cannot legally purchase a prescription drug off-label without a prescription. Therefore, no "bargaining" for a warranty (or discount) for safety and effectiveness is implicated. The knowledge of the purchaser is irrelevant absent the proper government mandated warnings—it should not have been in commerce in the first place. There is no state common law contract theory for the sale of ineffective and unsafe prescription drug medications anymore. Genzyme's

knowledge that the chattel would be used in a medical rescue only vitiates these facts.[12]

**5.      The lower court incorrectly invokes Rule 12(b)(6) to dismiss the case on the merits for a failure to pin cite a statute for negligence per se.**

The lower court states that the Plaintiffs' negligence per se claims are dismissed with prejudice "without specifying what provision of the Florida law Genzyme violated." Add. 64.  The lower court dismisses the Virginia claim for the same reason.

The Supreme Court disagrees with the lower court.  A failure to cite a statute is not a failure to state a claim under Rule 12(b)6.

> Federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief . . . they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." "[T]o ward off further insistence on a punctiliously stated "theory of the pleadings," petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to [the statute] '§ 1983'."

*Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014).

---

[12]    The specific state consumer protection statute claims also rest on the same theory that material information should have been disclosed to the patient and/or the doctor since it was a medical product that is inherently dangerous and intended to treat disease, not an innocuous ingredient used to "bake a cake" as the lower court analogizes. Add. 82. "[A] shop owner [like Genzyme] does not warrant that one cup of sugar (the only cup in stock) will make as sweet a cake as the two cups of sugar for which the recipe calls."

For the record, Virginia, Florida, Kentucky and Indiana all statutorily prohibit marketing a "misbranded" drug. The language of each statute is uniform. Selling a misbranded drug is prohibited "Unless its labeling bears adequate directions for use and such **adequate warnings** against use in those pathological conditions or by children where its use may be dangerous to health, *or* **against unsafe dosage** or methods or duration of administration or application, in such manner and form, ***as are necessary for the protection of users***. VA Code § 54.1-3462 Misbranded drug or device. (6)(b). Fla. Stat. § 499.007(6)(b); Ky. Rev. Stat. § 217.065 6(b). IN Code § 16-42-3-4(6)(b). Notably, pre-emption is not an issue since the FDA has never approved "low dose" Fabrazyme for treating Fabry disease.

The Plaintiffs' negligence per se claim should not be dismissed under rule 12(b)6 since the failure to allow amendment to cite a statute under Rule 8 is considered an abuse of discretion according to the Supreme Court decision in *Johnson v. City of Shelby, Miss.*

> **6.** **The lower court erred by failing to certify the question of the fiduciary role of a drug company when the company substitutes its medical judgment for that of a treating physician.**

The lower court states that "I do not find that Florida or Virginia would recognize this [case manager/patient relationship or Genzyme's triage decisions] to be a fiduciary relationship." Add. 80. However, Genzyme's extraordinary decision to veto lawful prescriptions undermines the core police powers of the state to

regulate health and safety under the 10th Amendment.[13] Genzyme made an affirmative decision to target U.S. state licensed physicians and their patients by their name, address, and name of their treating doctor. It is unlikely that the 50 States intended for drug companies to manage the States' public health during a drug shortage in contravention to its state licensed physicians' recommendations and their public health laws prohibiting misbranding.

By the lower court's reasoning, it would appear that a drug shortage loophole exists that eliminates the normal statutory protections banning the sale of unsafe, ineffective, and untested drugs or dosage schedules. This case is the first in U.S. history where a drug company decided who lives and dies during a drug shortage, notwithstanding that the company itself caused the shortage. It would be unprecedented for a court to grant a drug company such extraordinary power over the health and safety U.S. citizens as to be able to choose individual Americans by their name and address for survival or death, but not also require a duty of the utmost care to act for the benefit of patients.

---

[13]   Our Court "has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25, 25 S. Ct. 358, 361, 49 L. Ed. 643 (1905).

The First Circuit has traditionally avoided speculation on such core policy decisions. "We hesitate to 'trade judicial robes for the garb of prophet' . . . when an available certification procedure renders the crystal ball or divining rod unnecessary." *See Boardman v. United Servs. Auto Ass'n*, 742 F.2d 847, 851 (5th Cir. 1984) (quoting John R. Brown, *Certification – Federalism in Action*, 7 Cumb. L. Rev. 455, 455 (1977)). So given the absence of any . . . State Supreme Court]. decision directly on point – and in the spirit of "cooperative judicial federalism. . .. we opt to certify. (1st Cir. 1995) *Plourde v. Sorin Grp. USA, Inc.*, 23 F.4th 29, 36–37 (1st Cir. 2022).

In the alternative, the pleadings demonstrate a special relationship that "generally arise[s] when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection." *Schubert v. Genzyme Corp.*, No. 2:12CV587DAK, 2013 WL 4776286, at *5 (D. Utah Sept. 4, 2013)." Once Genzyme barred U.S. physicians from administering full doses, the Plaintiffs became completely reliant on Genzyme. Moreover, Genzyme assigning "case managers" to the Plaintiffs counts as a special relationship with a "plus factor" that patients trusted Genzyme with their medical care on "low dose" just like they would a physician. App. 89:271, 272, 161:474, and medical synopses App.19-40:1-24 esp. 2. Patients had nowhere to turn but Genzyme's case managers because their

physicians did not recommend low dosing, and "low dose" had never been tested on humans for FDA approval.

Recently, the Federal District Court in Massachusetts in another prescription drug case found that a drug company owed a duty to the plaintiff to monitor her health when it assigned her an individual case manager.

> "[She] has plausibly pled that Corcept, by assigning her "Patient Care Advocates" to monitor her health on Korlym, *see* Compl. ¶¶ 7-11, voluntarily assumed such a duty [of care], *see Thorson v. Mandell*, 402 Mass. 744, 748, 525 N.E.2d 375 (1988) No. CV 22-10072-WGY, 2022 WL 16857262, at *17 (D. Mass. Nov. 10, 2022).[14]

> See also App.52:FN 4: The Fabrazyme FDA label  Fabrazyme FDA label: 17. PATIENT COUNSELING INFORMATION Patients should be informed that a Registry has been established . . . [for Genzyme] <u>to monitor and evaluate long-term treatment effects</u> of Fabrazyme. *Emphasis added.*

The duty to fully warn patients is one that the Genzyme case managers themselves recognize towards their patients.  See App. 089:272 where a case manager states in an email that

> "Seems like the information was eeked out incrementally (to staff patients and stakeholders) with the **idea of not scaring patients** and Genzyme hoping for and trying to will the best possible outcome in terms of shortage… Rather than dashing people's hopes over and over again we could have helped them deal with reality… **I think there is a fine line between containing the message and keeping people in the**

---

[14]    *See also* Memorandum Add. 79 where the lower court acknowledged that "The relationship between Genzyme and Fabry patients may appear closer than a standard relationship….."

**dark. This was not the time for mushroom management**. (Keep them in the dark and watch them grow!) Without the complete picture, I felt like my communication with patients was inauthentic, stilted, and potentially damaging with some patients.

As a note, a fiduciary relationship requires disclosure of all material

facts during monitoring, which is an ongoing duty that extends to this day.

Genzyme has not ended its "case manager" service relationship with the

surviving Plaintiffs. [15]

---

[15] The lower court faults the pleading for not citing the source for the statement where Genzyme promised to protect the "most vulnerable." Add.80 citing to SAC ¶477 App.162. It was Exhibit N in the prior *Adamo* complaint, which still operates as judicially noticeable information. Specifically, "Genzyme.com: Patient Access to Treatment webpage" filed in Case 1:13-cv-11336-DPW Document 1-16 Filed 06/03/13 Page 62. stating

> "To address periods of product shortage, we consulted with health care providers, patient groups, and other experts to help us establish guiding principles for the fair and ethical distribution of the limited supply. These principles include prioritizing treatment to the **most vulnerable patients**, regardless of their pay status or geographical location, and getting individual patients and physicians involved in decision making for treatment allocations. Despite the hurdles we've confronted [during the Fabrazyme shortage], Genzyme remains committed to serving and supporting these patient communities now and into the future."
> First Circuit Appendix Vol. II, page A 524 for the consolidated *Hochendoner* appeal and attached currently in the Addendum p. 87.

**7. The lower court erred in ignoring the materiality of Genzyme's self-described knowledge that "low dose" is based on "bullshit data" and those taking it would be "insane" for Plaintiffs' fraud/fraudulent concealment claims.**

The lower court does not mention the fact that Genzyme failed to disclose that low dosing was "based on bullshit data" and that it would be "INSANE" to take at the "low dose," *supra*. The lower court argues that the Plaintiffs did not show reliance. However, the reliance and dependence of the Plaintiffs were absolute. They would not have bought "low dose" Fabrazyme had they known what Genzyme knew. Nobody would have. A drug that only has side-effects but no clinical treatment value is simply poison. This is especially true of a drug injected into the veins. Every time "low dose" Fabrazyme was administered, the Plaintiffs risked death for no reason except that it profited Genzyme. The Plaintiffs would not have injected it (much less paid for it) if they did not think it would provide a benefit to offset the risk of death. See App97:312. (All Plaintiffs who received "low doses" were led to believe that "something was better than nothing." Sarah Kulke, M.D., Medical Director, Genzyme, stated at such the Baystate Genetics and Genzyme supply update meeting on Monday, November 2nd, 2009, responding to Cheryl Sacks' question about the effectiveness of low dose, that "at least you're getting something.")

The lower court even notes that "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Bank of Montreal v. Signet Bank*, 193 F.3d 818,827 (4th

41

Cir. 1999). Add. 076.   Moreover, the accrual date for the fraud/fraudulent concealment date is the date of discovery of the fraud itself on May 21, 2020.[16]

> "[W]hen the fraud has been concealed <u>or is of such a character as to conceal itself</u>," and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff <u>discovers </u>the fraud. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir. 1995).

Genzyme's failure to disclose material information was "self-concealing" because the Plaintiffs do not have access to Genzyme's data or the Fabry Registry database, making it impossible to discover that the drug was completely ineffective. Alternatively, the fiduciary relationship is ongoing, so the duty to correct past material misrepresentations and omissions continues to this day, and so the tort continues.

In addition to damages for fraud/fraudulent concealment, the Plaintiffs have specifically requested that the court enforce Genzyme's' promise to monitor patients and order that the concealed data be published publicly (in a deidentified manner.) App.:149(f) Monitoring without public reporting simply perpetuates ongoing concealment of these critical data on "unknown hazards" articulated under *Wyeth v. Levine*, *supra*.

---

[16] The lower court improperly ignores the pleading for age of minority in a subset of the Plaintiffs.   App.28:11 (Helton), App.29:12 (D.J., currently a minor), and App.30:13 (Johnson).

8. **The lower court misapplies the equity doctrine of unjust enrichment. The economic value of a pharmaceutical drug is measured by its medical value, not its mass weight.**

The lower court misapplies the equity doctrine of unjust enrichment. The lower court characterizes the off-label sale of the "low dose" drug as having a market value for its weight in milligrams instead of its medical value as a treatment for the disease. In other words, the lower court advocates that off-label "low dose" Fabrazyme has a sliding scale of economic value for a patient. This is not how anyone (doctors or patients or insurance companies or the law) views the market value of a prescription drug.

Reasonable consumers would all believe that safety and effectiveness of a drug are facts considered "basic to the transaction" for purchasing life-saving medicine. See Restatement (Second) of Torts § 551(2)(e) and Restatement of Restitution, § 16 comment c.[17] Restatement (First) of Restitution § 70 (1937). The lower court states that the "Plaintiffs have not shown that what they received from

---

[17] See Restatement (Second) of Torts, Comment on Clause (e), "The word 'basic' is used in this Clause in the same sense in which it is used in Comment *c* under § 16 of the Restatement of Restitution. A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic."

Genzyme was something of lesser value than what they intended to purchase or that they were operating "under a mistake of fact" as to what they would receive. Add. 81.

When the Plaintiffs were sold "low doses," they were not buying a commodity. The value of the drug is measured by its utility (effectiveness) versus risk (side effects). Since the drug was ineffective, it had no benefit. Therefore, it has no monetary value. "A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution from the other if the mistake was induced: (a) by the fraud of the payee, or (b) by his innocent and material misrepresentation." Restatement (First) of Restitution § 28 (1937). "This standard is an objective one." *Plant v. Merrifield Town Ctr. Ltd. P'ship,* 711 F. Supp. 2d 576, 591 (E.D. Va. 2010). ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other. [A]n action for restitution ... is not regarded as an action 'upon' the contract within the meaning or purpose of the Statute of Frauds and the remedy is not in general affected by the Statute.")" *Ala v. Chesser*, 5 So. 3d 715, 718 (Fla. Dist. Ct. App. 2009).

The Plaintiff's allegations do not present a situation where a reasonable person would have "diminished expectations" in the safety of effectiveness of "low dose" Fabrazyme. Indeed, Genzyme suppressed the Vedder study to cover up that low dosing was based on the "bullshit data" from the less clinically relevant Lubanda

study. App. 83:242. Additional vitiating facts include that the Plaintiffs did not request "low dose."  Genzyme decided the medical treatment for the Plaintiffs without consulting them or their treating physicians.  Moreover, the sale of ineffective and unsafe medication is per se illegal as discussed *supra*, so there is no legally cognizable method to bargain for anything less than an effective and safe drug.  Finally, the interference with the doctors' ability to administer the recommended treatment completely eliminated the Plaintiffs' power to protect themselves.

An I.V. drug with only side effects but no clinical benefit is simply poison.  It is the reason patent medicines have been outlawed.  The lower courts' doctrine of "paying the poisoner" for ineffective medication is manifestly unjust.  However, to the extent the Plaintiffs need to plead the side-effects they endured taking "low dose" Fabrazyme as evidence of unjust enrichment for paying for "low doses," the Plaintiffs request the opportunity to amend because this new requirement is a previously unknown pleading standard under Rule12(b)(6).

9.    **The class is improperly dismissed as to the numerosity, as it likely contains at least 75 members.**

The sensitization reaction has been reported in about 5% of the litigants from *Hochendoner* and *Adamo* (4 of 84 litigants).  This incidence rate is incredibly high for such a severe reaction in a group of patients.  It is not, as the lower court described, "a narrow and idiosyncratic" basis for determining numerosity.  Add. 56.

It is premature to dismiss to numerosity until the class can properly be assessed at the certification proceeding. *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir.1987).

The class claims for sensitization reactions reach the usual condition for finding numerosity by proper inference of the pleadings, so the class claims should be allowed to proceed to certification.

> **10. The lower court erred in dismissing Ms. Wilkins' claims to negligence per se, fraud/fraudulent concealment and breach of fiduciary on the merits without providing a reasoned analysis.**

The lower court ignores Ms. Wilkins' claims for negligence per se, fraud/fraudulent concealment, and breach of fiduciary under Indiana and Kentucky law, but still dismisses her claims with prejudice. Without a providing a reasoned analysis, a dismissal with prejudice is an abuse of discretion.

## CONCLUSION

Drug shortages pose complex public health issues and public policy problems.[18] However, selling ineffective and adulterated medications is always

---

[18] Unguru Y, et al. "An Ethical Framework for Allocating Scarce Life-Saving Chemotherapy and Supportive Care Drugs for Childhood Cancer," J Natl Cancer Inst. 2016 Jan 29; 108(6). "Beyond the associated economic costs, drug shortages directly affect patients' lives. Drug shortages have resulted in increased medication errors, delayed administration of lifesaving therapy, inferior outcomes, and patient

wrongful conduct, especially during a drug shortage.  The federal courts have already served a vital public health and policy role by allowing other litigants to uncover at least some of Genzyme's misconduct during the Fabrazyme shortage in *Schubert v. Genzyme*.  This Court should continue in this critical public health and policy role of saving lives as articulated under *Wyeth v. Levine* by reversing the lower court.


Respectfully submitted,

Dated:  January 9, 2023          /s/ C. Allen Black, Jr.

                                 /s/ Jonathan M. Gesk

---

deaths). Drug shortages prevent clinicians from providing standard-of-care therapies and hinder critical clinical research efforts."  Available at https://academic. oup.com/jnci/article-lookup/doi/10.1093/jnci/djv392

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

I, C. Allen Black, Jr., certify as follows:

1)      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 1 11,293 words excluding the exempted sections

2)      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements because this brief has been prepared in 14 point Times New Roman font using Microsoft Word.


Dated:  January 9, 2023            <u>/s/ C. Allen Black, Jr.</u>

# CERTIFICATE OF SERVICE

I, C. Allen Black, Jr., hereby certify that on January 9, 2023, I filed the foregoing electronically with the United States Court of Appeals for the First Circuit using the CM/ECF system and caused it to be served on all registered participants via the Notice of Electronic Filing.

Dated: January 9, 2023

<div style="margin-left: 50%;">

/s/ C. Allen Black, Jr.

Counsel for the Plaintiffs
C. Allen Black
PA I.D. No. 202501
LAW OFFICE OF C. ALLEN BLACK
Bldg. 1B, Ste. 200
322 North Shore Dr.
Pittsburgh, PA 15212
Telephone: 412.908.3268
Email: drallenblack@gmail.com

</div>

# ADDENDUM

TRINA WILKINS; JAMES BISHOP; LISA BISHOP; AMBER BRITTON;
TONI CORDOVA; JOHN CORTINA; JILL CORTINA; GEORGE DEMKO;
DOVAN HELTON; MARY HELTON; NATE BROOKS; SYDNEY JOHNSON;
PLAINTIFF D.J.; DAMON LAFORCE; MICHAEL MASULA; ERIN MASULA;
JAMES MATTHEWS; THOMAS OLSZEWSKI; DARLENE COOKINGHAM;
THOMAS STANZIANO; WENDY STANZIANO; EDDIE VIERS, individually as
surviving spouse of Teresa Viers, deceased, AND as Personal Representative of the
ESTATE OF TERESA VIERS; WILLIAM MCNEW; JEANNE WALLACE
individually as surviving spouse of Joseph Wallace, deceased, AND as
Personal Representative of the ESTATE OF JOSEPH WALLACE;
JAMES WALLACE; and SAMUEL WALLACE,
*Plaintiffs-Appellants*,
v.
GENZYME CORPORATION,
*Defendant-Appellee*
SANOFI-AVENTIS, SA; SANOFI-AVENTIS U.S., LLC,
*Defendants*.

# TABLE OF CONTENTS

**Docket Number: (1:21-cv-10023)**

MEMORANDUM AND ORDER, September 14, 2022 ............................ Add. 001

ORDER OF DISMISSAL, September 14, 2022 ........................................ Add. 084

Exhibit N, Complaint, Adamo et al., No. Case 1:13-cv-11336-DPW
Document 1-16 Filed 06/03/13 ......................................................... Add. 085

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRINA WILKINS, ET AL, | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | 21-10023-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| GENZYME CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER
September 14, 2022

Table of Contents

I. BACKGROUND............................................... 4
  A.  The Parties ........................................... 4
  B.  Fabry Disease, Fabrazyme, and the 2009 Shortage ......... 5
  C.  Prior Litigation ...................................... 6
    1.  Hochendoner I: Consolidation in the District of
    Massachusetts ........................................... 7
    2.  Hochendoner II: In the Court of Appeals for the First
    Circuit ................................................. 8
  D.  The Instant Litigation ............................... 10
    1.  Hochendoner III – Before Transfer: In the Southern
    District of Indiana ................................... 10
    2.  Hochendoner IV: After Transfer in the District of
    Massachusetts ......................................... 11
      a.  Operative Second Amended Complaint ................. 11
      b.  Proposed Third Amended Complaint ................... 14
  E.  Genzyme's Asserted Grounds for Dismissal ............... 14
II. THRESHOLD CONSIDERATIONS................................ 15
  A.  Choosing the Law ..................................... 16
  B.  Amending the Complaint ............................... 16
III. MOTION TO DISMISS..................................... 17
  A.  Subject Matter Jurisdiction .......................... 19
    1.  Expiration of Claims ............................... 20
      a.  Claims Related to Product Liability Under Indiana Law 21
      b.  Claims Subsumed by Products Liability ............... 22
      Under Indiana Law.................................... 22
      c.  Loss of Consortium Claims Under Indiana Law ......... 24
      d.  Other State Statutes ............................... 25
    2.  Accrual of Claims .................................. 26
      a.  Harm Caused by Law Dosing and Contamination ........ 30
      b.  Harm Caused by Sensitization ....................... 31
      c.  Harm Caused by Fraud ............................... 31
      d.  Summary ........................................... 32
    3.  American Pipe Tolling............................... 35
    4.  Tolling Agreement .................................. 38
    5.  Indiana Journey's Account Statute ................... 42

    6.   What Is Preserved ..................................... 47

  B.   Standing ............................................... 48

    1.   Theories of Harm ..................................... 50

      a.   Acceleration Theory .............................. 50

      b.   Sensitization Theory ............................. 51

      c.   Vesivirus Theory ................................. 51

      d.   Life Expectancy Theory ........................... 52

      e.   Financial Theory ................................. 52

    2.   Success of the Five Theories of Harm ................. 52

IV. CLASS ACTION STATUS..................................... 56

V. MERITS................................................... 57

  A.   Rule 9(b) Heightened Pleading Standards ................ 58

  B.   Negligence ............................................. 59

    1.   Negligent Design Theory ............................. 61

    2.   Negligent Manufacture Theory ........................ 62

    3.   Failure to Warn Theory .............................. 62

  C.   Negligence Per Se ..................................... 64

  D.   Strict Liability ...................................... 65

  E.   Breach of Warranty .................................... 65

    1.   Claims for Breach of Implied Warranties ............. 65

    2.   Claims for Breach of Expressed Warranty ............. 68

  F.   Florida Deceptive and Unfair Trade Practices .......... 69

  G.   Indiana Product Liability Act and Kentucky Product
Liability Act ............................................. 70

  H.   Kentucky Consumer Protection Act ...................... 72

  I.   Virginia Consumer Protection Act ...................... 74

  J.   Virginia False Advertising Act ........................ 75

  K.   Fraud and Fraudulent Concealment ...................... 75

  L.   Breach of Fiduciary Duty .............................. 78

  M.   Unjust Enrichment ..................................... 80

  N.   Loss of Consortium .................................... 82

VI. THIRD AMENDED COMPLAINT................................. 82

VII. CONCLUSION............................................. 83

Fabrazyme is a drug prescribed to treat a rare genetic disorder, Fabry disease.  A shortage of the drug several years ago led numerous Fabry patients – among them Plaintiffs in this case - to sue Genzyme, Fabrazyme's manufacturer.  The First Circuit rejected Plaintiffs' claims in that litigation for lack of standing.  I now consider new litigation begun thereafter by Plaintiffs – in another federal district court outside the First Circuit - that seeks to improve on the pleadings the First Circuit rejected.  Most Plaintiffs now before me as a result of transfer of the litigation to this district again fail to establish standing.  But there are four who manage to do so on a basis recognized in the prior litigation.  Nevertheless, those Plaintiffs otherwise plead their claims inadequately as to the merits.  Accordingly, in the end I have determined to dismiss this action in its entirety with respect to all Plaintiffs.

## I. BACKGROUND

### A.    *The Parties*

Plaintiffs are twenty-six named individuals who either suffer from Fabry disease and have taken Fabrazyme or are relatives of such individuals according to the now-operative complaint.  Second Amended Complaint ("SAC") at ¶¶1-26, ECF No. 67.  Among named Plaintiffs are citizens of California, Florida, Indiana, Massachusetts, Michigan, Nevada, New York, North Carolina, Pennsylvania, Washington, Tennessee, and Virginia.

Defendant Genzyme Corporation ("Genzyme") is a
Massachusetts corporation with a principal place of business in
Cambridge, Massachusetts; the company markets and sells
Fabrazyme throughout the United States. *Id.* at ¶27.

**B.    *Fabry Disease, Fabrazyme, and the 2009 Shortage***

Fabry disease arises in roughly 1 in 3,000 births.  SAC at
¶31.  The condition results from a missing or mutated gene for
the enzyme alpha-galactosidase, which is needed to metabolize
the fat globotriaosylceramide ("GL-3").  *Id.* at ¶32.  Without
the enzyme, GL-3 builds up in cells, blood vessels, and organs,
causing inflammation and death, typically from strokes, kidney
failure, or heart enlargement.  *Id.*

Fabrazyme is a synthetic version of alpha-galactosidase.
*Id.* at ¶¶33-34.  It cannot undo prior harm from Fabry disease but
it mitigates the condition.  *Id.* at ¶35.  Because Fabrazyme
metabolizes quickly, the standard regimen is to receive
injections every two weeks.  *Id.* at ¶36.  Although at all
relevant times Fabrazyme was the only medication for Fabry
patients available in the United States; a competitor drug
called Replagal® was sold in other countries.  *Id.* at ¶140.

A Fabrazyme shortage arose in June 2009 when Genzyme's
production stalled due to various problems at its manufacturing
facility.  *Hochendoner* v. *Genzyme Corp.*, 95 F. Supp. 3d 15, 18
(D. Mass. 2015) *("Hochendoner I"), aff'd in part, vacated in*

*part, remanded*, 823 F.3d 724 (1st Cir. 2016) *("Hochendoner II")*.
These problems included a contamination of Genzyme's bioreactors
with vesivirus.  SAC at ¶¶42-87.  "During this shortage, Genzyme
adopted a rationing plan under which United States Fabry
sufferers would be allocated less than the recommended dose, and
newly diagnosed Fabry patients would not be prescribed the
drug."  *Hochendoner I*, 95 F. Supp. 3d at 18.

**C.   *Prior Litigation***

Following the shortage, patients filed lawsuits against
Genzyme in the Western District of Pennsylvania ("the
*Hochendoner* action")[1] and in this Court ("the *Adamo* action"); I
sometimes refer in this Memorandum to these actions collectively
as the *Hochendoner*/*Adamo* actions.[2]  *See Hochendoner I*, 95 F.

---

[1] Certain of the plaintiffs now again before me — Amber Britton,
George Demko, Michael Masula, Erin Masula, Thomas Olszewski,
Darlene Cookingham, Thomas Stanziano, and Wendy Stanziano — were
plaintiffs in the *Hochendoner* action originally filed in the
United States District Court for the Western District of
Pennsylvania on March 9, 2011. *See Hochendoner* v. *Genzyme Corp.*,
No. 2:11-cv-00313-CB (filed Mar. 9, 2011, W.D. Pa.), ECF No. 1;
No. 1:11-cv-10739-DPW (filed June 30, 2011, D. Mass.), ECF No.
29.
[2] The following plaintiffs now again before me — Trina Wilkins,
James Bishop, Lisa Bishop, Toni Cordova, John Cortina, Jill
Cortina, Mary Helton, Donovan Helton, D.J., Sydney Johnson,
Damon LaForce, James Matthews, Eddie Viers, and Jeanne Wallace —
were plaintiffs in the *Adamo* action originally filed in this
Court on June 3, 2013. *See Adamo* v. *Genzyme Corp.*, 1:13-cv-
11336-DPW (filed June 3, 2013, D. Mass.), ECF No. 1.
Additionally, several new Plaintiffs now before me are relatives
of *Adamo* plaintiffs.  They include William McNew (surviving son
of Teresa Viers), SAC ¶23, James and Samuel Wallace (surviving

6

**006**

Supp. 3d at 20-21; *see also Schubert* v. *Genzyme Corp.*, No.
2:12CV587DAK, 2013 WL 4776286, at *1 (D. Utah Sept. 4, 2013).[3]
Upon transfer by the Western District of Pennsylvania to this
Court in *Hochendoner I*, I consolidated the two actions and ruled
on motions to dismiss in both matters.  95 F. Supp. 3d at 21.  I
granted the motions to dismiss, finding that the complaint
failed under Rules 8 and 12(b)(6) of the Federal Rules of Civil
Procedure.  *Id.*  The First Circuit affirmed — "with one small
exception," discussed below — based on standing, an issue not
raised until appeal.  *Hochendoner II*, 823 F.3d at 728, 730 (1st
Cir. 2016).

    1.   <u>*Hochendoner I*: Consolidation in the District of
Massachusetts</u>

    I found the *Hochendoner/Adamo* complaints broadly described
"three possible types of causation leading to three possible
types of injury suffered by [p]laintiffs."  *Hochendoner I*, 95 F.
Supp. 3d at 23.  The first causal chain posited that lower doses
of Fabrazyme reduced the drug's effectiveness, leading to "a

_____

sons of Joseph Wallace), *id.* ¶¶25-26, and Nate Brooks (spouse of
Mary Helton), *id.* ¶10.
[3] An individual plaintiff, separate from the Plaintiffs here,
sued Genzyme in *Schubert*.  Throughout their Second Amended
Complaint, Plaintiffs cite extensively to the Proposed Fourth
Amended Complaint in *Schubert*, which described internal
communications at Genzyme concerning the Fabrazyme shortage.
*Schubert* ended in June 2015 with a stipulated motion to dismiss
with prejudice all claims and causes of action against Genzyme.
*Schubert* v. *Genzyme Corp.*, 2:12-cv-00587-DAK (D. Utah dismissed
June 24, 2015), ECF No. 195.

return of symptoms in Fabry patients." *Id.*  The second causal

chain posited that lower doses of Fabrazyme accelerated the

course of the disease.  *Id.*  The third causal chain posited that

Genzyme's Fabrazyme vials were contaminated with particulate

steel, glass, and rubber.  *Id.*

For the latter two alleged causal chains — acceleration and

contaminants — I found the pleading insufficient to provide fair

notice as required by Fed. R. Civ. P.8 as to which of the

plaintiffs suffered injury under those theories.  *Id.* at 24.

For the first causal chain — effectiveness reduction — I

dismissed the counts for failure to state a claim under Fed. R.

Civ. P.12(b)(6).  As a result, numerous state common law claims

of negligence, negligence per se, strict liability, breach of

warranty, loss of consortium, and claims under state consumer

protection acts and state product liability acts were dismissed.

*Id.* at 29-35.

    2.   <u>*Hochendoner II*: In the Court of Appeals for the First</u>
<u>Circuit</u>

On appeal, the *Hochendoner I* plaintiffs only pursued the

acceleration and contaminant theories.  The First Circuit found

these claims failed the Article III standing requirement.

Standing, the First Circuit explained on appeal, requires a

"plaintiff-by-plaintiff and claim-by-claim analysis" that

"demands allegations *linking* each plaintiff to each of [the

alleged] injuries." *Hochendoner II,* 823 F.3d at 733 (emphasis added).  The Court of Appeals observed that the complaints' allegations did not show a particularized injury because no specific information was referenced regarding the harm experienced by each individual plaintiff.  *Id.*   The Court of Appeals determined that the *Hochendoner I* plaintiffs made "no assertion at any point in the complaints that any specific plaintiff took or received a dose contaminated with particulate matter"; they simply alleged broadly that Genzyme produced contaminated Fabrazyme.  *Id.* at 732.

However, the First Circuit reversed my order with respect to a somewhat different causation theory — the "increased risk" theory — which it found successfully alleged as to one plaintiff, James Mooney (not a plaintiff here).  That theory, a variant of the "reduced effectiveness" theory, posited that, by forcing patients to forego Fabrazyme doses, Genzyme caused an "increased risk and severity of acute adverse reactions due to inconsistent infusion schedules," the complaint adequately alleged that Mr. Mooney suffered "an allergic reaction attributable to his exposure to a reduced dose of Fabrazyme." *Id.* at 733-35.  The First Circuit further found the Mooney claims on that theory might satisfy Fed. R. Civ. P. 12(b)(6) and thus vacated the dismissal of those claims and remanded to

evaluate the pleading further to see whether the pleading was adequate.  *Id.* at 735.

Because it chose to affirm dismissal of plaintiffs' claims for lack of standing — that is, a dismissal for lack of subject matter jurisdiction, which "normally operates without prejudice" — the First Circuit directed on remand clarification that "the judgment is to operate without prejudice as to claims based on the acceleration and contaminant injuries."  *Id.* at 736.

**D.    *The Instant Litigation***

1.    *Hochendoner III* – Before Transfer: In the Southern District of Indiana

Plaintiffs now before me were unsuccessful in settling their claims in the wake of remand.  Nearly four years later, on February 29, 2020, they filed the present action in the United States District Court for the Southern District of Indiana. *Wilkins* v. *Genzyme Corp.*, 20-cv-00051-TWP-DML (S.D. Ind. filed Feb. 29, 2020) ("*Hochendoner III*").[4]  On May 6, 2020, they filed a First Amended Complaint changing identification of the entity or entities alleged to be the defendant.  First Amended Complaint ("FAC"), *id.* (S.D. Ind. May 6, 2020), ECF No. 10.  On

---

[4] Although the first named plaintiff in *Hochendoner I* and *Hochendoner II* is not a plaintiff in the litigation transferred to my docket from the Southern District of Indiana, I will continue to refer to the case — before transfer as *Hochendoner III* and after transfer as *Hochendoner IV* — to emphasize its status as a descendant in the *Hochendoner* family of litigation.

October 5, 2020, Plaintiffs filed the now-operative Second
Amended Complaint, naming Genzyme as the sole defendant.  SAC,
*id.* (S.D. Ind. Oct. 5, 2020), ECF No. 67.

> 2.   *Hochendoner IV*: After Transfer in the District of
>      Massachusetts

In the wake of remand, the plaintiffs entered into
settlement negotiations with Genzyme.  During these
negotiations, the plaintiffs and Genzyme struck an agreement on
May 17, 2017 that tolled "[a]ny applicable statutes of
limitations pertaining to any matters asserted" during the
*Hochendoner I* and *Adamo* lawsuits.  [ECF No. 105-1 at ¶1]
Plaintiffs now before me were unsuccessful in settling their
claims.  I came to preside over this matter, now *Hochendoner IV*,
following transfer pursuant to 28 U.S.C. § 1404(a).  Transfer
Order*, id.* (S.D. Ind. Dec. 30, 2020), ECF No. 78.  Meanwhile, in
response to the pending motion to dismiss the Second Amended
Complaint in this litigation again in this Court, Plaintiffs
moved, ECF No. 105, to file a Third Amended Complaint, ECF No.
105-2.

> a.   *Operative Second Amended Complaint*

The operative Second Amended Complaint makes class
allegations as to payments for defective and/or ineffective
Fabrazyme, in addition to twenty-four individual counts.[5]  The

---

[5] Although these counts are labeled "individual" counts, they are

class allegations are under Fed. R. Civ. P. 23 on behalf of five
representative plaintiffs,[6] the other plaintiffs named in the
complaint, and "all others similarly situated," defined to
include "any and all individuals residing in the United States
of America and who have been diagnosed with Fabry disease,
received Fabrazyme at any time from July 1, 2009 through March
2012 in a reduced dose amount, and who paid for the reduced dose
Fabrazyme, either directly or through an insurance plan and the
spouses of any such person."  ECF No. 67 at ¶342.  Plaintiffs
say that I have subject matter jurisdiction under the Class
Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

The individual claims include nine counts under common law
(Counts 1-4, 20-24) and several under state statutes concerned
with deceptive and unfair trade practices (Counts 5, 9, 11-14,
and 18), product liability (Counts 6-7, 10, and 19), consumer
protection (Counts 8 and 15), false advertising (Count 16), and
wrongful death/survival (Count 17).

The individual claims, stated in the order presented in the
Second Amended Complaint, are as follows:

1. Negligence
2. Negligence per se
3. Strict Liability

---

still apparently pled in support of the class claims and each
includes reference to "all others similarly situated."
[6] These five co-representative plaintiffs are Trina Wilkins,
George Demko, Michael Masula, Thomas Olszewski, and Tom
Stanziano.  SAC at ¶342.

4.  Breach of Warranty
5.  Florida Deceptive and Unfair Trade Practices Act Violation
6.  Indiana Products Liability Action Violation
7.  Product Liability Act of Kentucky Violation
8.  Kentucky Consumer Protection Act Violation
9.  Massachusetts Unfair and Deceptive Trade Practices Act Violation
10. Michigan State Product Liability Act Violation
11. Michigan State Law Deceptive Trade Practice Violation
12. Nevada State Law Deceptive Trade Practice Violation
13. North Carolina Unfair and Deceptive Trade Practices Act Violation
14. Pennsylvania Unfair Trade Practices Consumer Protection Law Violation
15. Virginia Consumer Protection Act Violation
16. Virginia Prohibition of False Advertising Violation
17. Virginia Wrongful Death or in the alternative Survival Action Claims
18. Washington Uniform Deceptive Trade Practices Act
19. Washington Product Liability Act Violation
20. Fraud
21. Fraudulent Concealment
22. Breach of Fiduciary Duty
23. Unjust Enrichment
24. Loss of Consortium

It is worth noting that Plaintiffs flag three ways in which the current lawsuit seeks to fix problems identified with their claims in *Hochendoner I* and *Hochendoner II*. First, they say their injuries "are discussed individually and not in the aggregate." Opposition to MTD at 6, ECF No. 108. Second, they say Plaintiffs "who received 'low doses' plead 'acceleration' of their disease," an allegation they contend "is vetted pleading language as a cause of action" under the First Circuit's decision in *Hochendoner II*. *Id.* Third, they say they "plead anaphylactic reactions to 'low dose' Fabrazyme," which they contend is also vetted language under *Hochendoner II*. *Id.* I

13

**013**

observe also that Plaintiffs newly allege in the Second Amended
Complaint extensive contamination of Fabrazyme dosages with
vesivirus, the pathogen found in Genzyme's bioreactors that led
to the Fabrazyme shortage.  *See* SAC at ¶¶42-87.

>    b.   *Proposed Third Amended Complaint*

Although the Second Amended Complaint remains the operative
pleading before me, Plaintiffs seek to file a Third Amended
Complaint, ("TAC") ECF No. 105, which they say is appropriate in
response to Genzyme's Motion to Dismiss (described below).  The
Third Amended Complaint would bring four small changes.  First,
it would attach a tolling agreement the parties entered into
after the decision in *Hochendoner II*.  *Id.* ¶18.  Second, it
would add allegations based on a draft of a letter that Genzyme
included with its Motion to Dismiss.  *Id.* ¶20.  Third, it would
drop causes of action under the Massachusetts Deceptive Trade
Practices Act, Washington Uniform Deceptive Trade Practices Act,
and Washington Product Liability Act.[7]  *Id.* ¶24.  Fourth, it
would drop claims related to 2013 and 2015 contaminations at the
Framingham Plant.  *Id.* ¶25.

**E.   Genzyme's Asserted Grounds for Dismissal**

Defendant presents four grounds for dismissal of this case.

_____

[7] Plaintiffs only directly reference dropping the Massachusetts
claim, but the Washington claims are apparently withdrawn as
well, since they do not appear in the proposed Third Amended
Complaint.

First, Genzyme says the litigation should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, because all putative class claims that support federal jurisdiction are untimely and complete diversity is lacking between the parties.  In any event, Genzyme contends I should decline to exercise supplemental jurisdiction over any remaining state law claims.  Second, Genzyme contends each Plaintiff lacks standing as another reason to dismiss under Fed. R. Civ. P.12(b)(1).  Third, Genzyme contends Plaintiffs' claims all essentially sound in fraud and fail to meet the Fed. R. Civ. P.9(b) particularity standard.  Fourth, Genzyme contends Plaintiffs have failed to state a claim under Fed. R. Civ. P.8 and Fed. R. Civ. P.12(b)(6).

As to the proposed Third Amended Complaint, Genzyme says I should deny this request outright, because presenting another complaint at this point in the litigation would be prejudicial and is futile, since the proposed Third Amended Complaint will not overcome the inadequacies of the Second Amended Complaint that provide the basis for dismissal.

## II. THRESHOLD CONSIDERATIONS

I must identify at the outset two basic threshold considerations — choice of law and whether and how to treat a proposed amended complaint — that shape my approach to consideration of Genzyme's motion to dismiss contentions.

15

**015**

**A.   Choosing the Law**

As alleged, this is a diversity case upon transfer from the United States District Court for the Southern District of Indiana, albeit said to have been raised under the Federal Class Action Fairness Act.  In these circumstances, "a federal court sitting in diversity or exercising supplemental jurisdiction over state law claims must apply state substantive law, but a federal court applies federal rules of procedure to its proceedings."  *Hoyos* v. *Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007) (citing *Gasperini* v. *Ctr. For Humanities, Inc.*, 518 U.S. 415, 427 (1996)).  For questions of state law, I follow Indiana choice-of-law rules, as would an Indiana federal court sitting in diversity.  *See AER Advisors, Inc.* v. *Fidelity Brokerage Servs., LLC*, 921 F.3d 282, 289 (1st Cir. 2019) ("[T]he transferee court applies the *state law* that the transferor court would have applied to any questions of *state law*."); *Gre-Ter Enter., Inc.* v. *Mgmt. Recruiters Int'l, Inc.*, 329 F. Supp. 3d 667, 675 (S.D. Ind. 2018) (citing *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  For questions of federal law, I apply federal law as interpreted by the First Circuit.  *AER Advisors*, 921 F.3d at 289-91.

**B.   Amending the Complaint**

Fed. R. Civ. P.15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or

the court's leave," and that the court "should freely give leave when justice so requires."  Fed. R. Civ. P.15(a)(2).  That said, "amendments may be denied for several reasons, including 'undue delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment.'"  *Hagerty ex rel. United States* v. *Cyberonics, Inc.*, 844 F.3d 26, 34 (1st Cir. 2016) (quoting *United States ex rel. Rost* v. *Pfizer, Inc.*, 507 F.3d 720, 733-34 (1st Cir. 2007), *overruled on other grounds by Allison Engine* v. *United States ex rel. Sanders*, 553 U.S. 662 (2008)).  In this posture, "'[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."  *Glassman* v. *Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996).  In canvassing Genzyme's contentions in support of the operative Second Amended Complaint, I am alert to the implications for allowing a proposed Third Amended Complaint to become the operative pleading in the litigation.

### III. MOTION TO DISMISS

I address first the standard for a Rule 12(b)(6) motion, the standard integral to other issues before me.  I "assume that well-pleaded facts are true and ask whether such facts and inferences reasonably drawn from those facts plausibly state a claim."  *Doe* v. *Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir. 2020) (citing *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).

However, I do not accept "legal conclusions clothed as factual allegations." *Thompson* v. *JPMorgan Chase Bank, N.A.*, 982 F.3d 809, 811 (1st Cir. 2020) (citing *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555-56 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. The well-pleaded facts must permit me to "infer more than the mere possibility of misconduct." *Id.* at 679. Plaintiffs must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

I employ this Rule 12(b)(6) standard as well for Rule 12(b)(1) motions. "Rule 12(b)(1) motions challenging subject-matter jurisdiction are divided into two categories: facial challenges and factual challenges." *Cebollero-Bertran* v. *Puerto Rico*, 4 F.4th 63, 69 (1st Cir. 2021). In the posture of Genzyme's motion to dismiss, with its "facial challenges [Genzyme] raises a question of law without contesting the facts." *Id.* Accordingly, "[t]he analysis is essentially the same as a Rule 12(b)(6) analysis: [I] accept the well-pleaded facts alleged in the complaint as true and ask whether the plaintiff has stated a plausible claim that the court has subject matter jurisdiction." *Id.*

Similarly, the standing analysis under Rule 12(b)(1) mirrors Rule 12(b)(6) analysis. "[A]t the pleading stage, the

18

**018**

plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action.  Neither conclusory assertions nor unfounded speculation can supply the necessary heft." *Hochendoner II*, 823 F.3d at 731.

With recognition that Genzyme suggests the proposed Third Amended Complaint is futile, I turn first to Genzyme's Motion to Dismiss as applied to the currently operative Second Amended Complaint.  *See supra* Section II.B.  But I reference points that would be added by the proposed Third Amended Complaint, when relevant.[8]  In addressing the Motion to Dismiss, I start with the arguments about subject matter jurisdiction.  This is because "federal courts are required to determine whether Article III jurisdiction exists prior to proceeding to the merits of the case." *See United Seniors Ass'n, Inc.* v. *Philip Morris USA*, 500 F.3d 19, 23 (1st Cir. 2007).

## A.   *Subject Matter Jurisdiction*

Genzyme contends I lack subject matter jurisdiction because the claims underlying the CAFA class claims — the only aspect of this litigation that could support federal jurisdiction in the

---

[8] For purposes of this analysis, I ignore the 2013 and 2015 claims concerning the Framingham plant and the Massachusetts and Washington claims, all of which the plaintiffs have abandoned in the Third Amended Complaint.  *See supra* note 7 and accompanying text.

first place — are all time-barred.  For their part, Plaintiffs

say tolling under *American Pipe & Const. Co.* v. *Utah*, 414 U.S.

538 (1974), Indiana's Journey Account Statute,[9] and a May 2017

tolling agreement[10] between the parties' work to preserve their

claims.

I begin my analysis by identifying the relevant statutes of

limitations and when Plaintiffs' claims accrued, in order to

assess if and when any of the claims have expired.  I then

address *American Pipe* tolling, the tolling agreement, and

Indiana's Journey's Account Statute.

1.   Expiration of Claims

Because statutes of limitations are substantive law under

federal direction, *see Guaranty Trust Co. of New York* v. *York*,

_____

[9] Plaintiffs also reference the Massachusetts Savings Statute,
but Massachusetts law does not apply in this circumstance,
because I am directed by Massachusetts law to apply Indiana law.
*See Hemric* v. *Reed & Price Mfg. Co.*, 739 F.2d 1, 3 (1st Cir.
1984) ("[W]e are aware of no case suggesting that Massachusetts
would abandon the traditional rule that local law of the forum
determines whether an action is barred by a statute of
limitations.").
[10] A copy of this agreement is attached to the Third Amended
Complaint and undisputed by the parties.  Although I have yet to
rule on allowing the Third Amended Complaint, I consider its
contents here.  "While, ordinarily, a district court's review
under Rule 12(b)(6) is limited to consideration of the facts set
forth in the complaint and the documents attached thereto, an
exception exists for 'documents the authenticity of which are
not disputed by the parties . . . .'  *Town of Acton* v. *W.R.
Grace & Co. Conn. Techs.*, Inc., No. 13-12376-DPW, 2014 WL
7721850, at *5 (D. Mass. Sep. 22, 2014) (quoting *Watterson* v.
*Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

326 U.S. 99, 110-12 (1945), I rely on Indiana choice-of-law principles. Under those principles, statutes of limitations are treated as procedural, so Indiana's statutes of limitations apply. *Autocephalous Greek-Orthodox Church of Cyprus* v. *Goldberg & Feldman Fine Arts Inc.*, 717 F. Supp. 1374, 1385 (S.D. Ind. 1989), *aff'd*, 917 F.2d 278 (7th Cir. 1990). But there is an exception. For statutory claims arising under the law of another state, that state's relevant statute of limitations applies. *Shearer* v. *Thor Motor Coach, Inc.*, 470 F. Supp. 3d 874, 879 (N.D. Ind. 2020). And there is an exception to this exception: If the statutory claim originated at common law, then Indiana's statutes of limitations still apply. *Id.* at 879-880; *see also Big Rivers Elec. Corp.* v. *Gen. Elec. Co.*, 820 F. Supp. 1123, 1125-26 (S.D. Ind. 1992).

> a.   *Claims Related to Product Liability Under Indiana Law*

Indiana's statutes of limitations apply for all the common law claims here — as well as the claim under the Indiana Product Liability Act. The common law claims are for negligence, negligence per se, strict liability, breach of warranty, fraud, fraudulent concealment, breach of fiduciary duty, unjust enrichment, and loss of consortium.

A two-year statute of limitations applies for the common law claims. A two-year statute of limitations for claims

21

**021**

related to products liability, as alleged here, negligence,
negligence per se, and strict liability, arises from the Indiana
Products Liability Act.  *See* Ind. Code § 34-20-3-1.  Likewise,
the statute of limitations is set at two years for breach of
fiduciary duty under Indiana law.  *See* Ind. Code § 34-11-2-4;
*Shriner* v. *Sheehan*, 773 N.E. 2d 833, 846 (Ind. Ct. App. 2002).

> b.  *Claims Subsumed by Products Liability*
>     *Under Indiana Law*

In Count Four, Plaintiffs allege various breaches of
express and implied warranties under common law.  [Dkt. No. 67
¶¶ 361-64.]  These claims are subsumed under the Indiana Product
Liability Act for two reasons, and accordingly a two-year
statute of limitations applies.  First, where a breach of
warranty claim is "tort-based," "several federal district courts
and other panels of the [Indiana] Court of Appeals" have found
the claim "subsumed into the [Indiana Product Liability Act]."
*Kovach* v. *Caligor Midwest,* 913 N.E.2d 193, 197 (Ind. 2009); *see*
*Cavender* v. *Medtronic, Inc.,* No. 3:16-CV-232, 2017 WL 1365354,
at *7 (N.D. Ind. Apr. 14, 2017) ("[I]f it walks like a duck and
quacks like a duck, it's a tort—not a breach of warranty claim—
and it is subsumed by the [Indiana Product Liability Act].").
Although Plaintiffs pleaded that low-dose Fabrazyme "is not fit
for the ordinary purpose for which it is customarily or
foreseeably used" [Dkt. No. 67 ¶362(d)] — language framing

22

Plaintiffs' claim in warranty — Plaintiffs did not provide additional facts that set the claim outside of tort.  [*See generally* Dkt. No. 67 ¶¶362-64.]  *See Lyons* v. *Leatt Corp.,* No. 4:15-CV-17-TLS, 2015 WL 7016469, at *3 (N.D. Ind. Nov. 10, 2015) (using language that framed plaintiff's claim as a breach of warranty did not shield it from being subsumed under the Indiana Product Liability Act where it sounded in tort).  Second, Plaintiffs did not bring their claim for breach of warranty under the Indiana adoption of the Uniform Commercial Code, which is "independent" from the Indiana Products Liability Act and provides for different damages.  *Atkinson* v. *P & G-Clairol, Inc.,* 813 F. Supp. 2d 1021, 1024-25 (N.D. Ind. 2011).

Similarly, the claims sounding in fraud and in unjust enrichment are subject to the two-year statute of limitations, since this litigation continues to present a products liability case and the fraud and unjust enrichment claims arise out of that framework.  In Indiana, it is "the nature or substance of the cause of action, rather than the form of the action, which determines the applicability of the statute of limitations." *Shideler* v. *Dwyer*, 417 N.E.2d 281, 285 (Ind. 1981) (quoting *Koehring Co.* v. *Nat'l Automatic Tool Co.,* 257 F. Supp. 282, 292 (S. D. Ind. 1966), *aff'd*, 385 F.2d 414 (7th Cir. 1967) (per

curiam)).[11]   "Where an unjust enrichment claim arises out of a
tort-based products liability claim as occurred here, Indiana
would apply a two-year limitations period."  *Juday* v. *Merck &
Co.*, No. CV 16-1547, 2017 WL 1374527, at *3 (E.D. Pa. Apr. 17,
2017) (citing *Knutson* v. *UGS*, 2007 WL 2122192 at *5 (S.D. Ind.
July 19, 2007) and *Schwindt* v. *Hologic, Inc.*, 2011 WL 3806511 at
*7 (S.D. Ind. Aug. 26, 2011)), *aff'd*, *Juday* v. *Merck & Co Inc*,
730 F. App'x 107 (3d Cir. 2018).  The same is true for the fraud
claims.  *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2007
WL 3334339, at *6 (E.D. La. Nov. 8, 2007) (finding under Indiana
law that two-year statute of limitations applied to fraud claims
in product liability suit).

> c.   *Loss of Consortium Claims Under Indiana Law*

Loss of consortium is a derivative claim, and thus tied to
the relevant statute of limitations for the loved one's claim;
consequently, it does not have a set statute of limitations but

---

[11] I recognize there is some debate about how far the Indiana
Supreme Court will ultimately take this doctrine in claims as
presented to be subsumed by other statutes of limitations based
on "form."  *See Lewis* v. *Methodist Hosp., Inc.*, 326 F.3d 851,
854-56 (7th Cir. 2003).  The crux of this debate is that there
are provisions in the Indiana code providing state statutes of
limitations — including for fraud — and that such provisions may
become meaningless if every claim is always read to be subsumed
by another relevant statute of limitations.  Here, the framing
of the litigation has firmly and consistently been in essence
as a product liability case.  *Cf. In re Vioxx Prods. Liab. Litig.*,
MDL No. 1657, 2007 WL 3334339, at *6 (E.D. La. Nov. 8, 2007).

will rely upon that of the claim from which it is derived.  *See Palmer v. Gorecki*, 844 N.E.2d 149, 157 (Ind. Ct. App. 2006).

       d.   *Other State Statutes*

All other claims brought are under statutes of other states.  I find it unnecessary to scrutinize whether Indiana courts would identify these claims as originating separately at common law, because the claims in all events have expired for purposes of Indiana law or the law of the other states, as I will explain momentarily.  To frame that explanation, I observe that the various state statutes of limitations are as follows:

- Three years for the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. § 95.11(3)(f); *Koski* v. *Carrier Corp.*, 347 F. Supp. 3d 1185, 1192 (S.D. Fla. 2017).

- One year for the Kentucky Products Liability Act.  Ky. Rev. Stat. Ann. § 413.140(1)(a).  *Bosch* v. *Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 737 (W.D. Ky. 2014).

- Two years for the Kentucky Consumer Protection Act.  Ky. Rev. Stat. Ann. § 367.220(5).  *Arnold* v. *Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 766-67 (E.D. Ky. 2019).

- Three years for the Michigan Product Liability Act.  Mich. Comp. Laws § 600.5805(12); *McMan* v. *C.S. Bard, Inc.*, No. 19-12670, 2021 WL 3079894, at *3 (E.D. Mich. July 21, 2021).

- Six years for the Michigan Consumer Protection Act.[12]  Mich. Comp. Laws § 445.911(9).

- Four years for the Nevada Deceptive Trade Practices Act.  Nev. Rev. Stat. § 11.190(2)(d).

- Four years for the North Carolina Deceptive Trade Practices Act.  N.C. Gen. Stat. § 75-16.2; *Dreamstreet Invs., Inc. v. MidCountry Bank.*, 842 F.3d 825, 830 (4th Cir. 2016).

- Six years for the Pennsylvania Consumer Protection Act.  42 Pa. Cons. Stat. § 5527(b); *Rodgers* v. *Lincoln Benefit Life Co.*, No. 19-cv-350, 2019 WL 4750193, at *2 (W.D. Pa. Sept. 30, 2019).

- Two years for the Virginia Consumer Protection Act.  Va. Code Ann. § 59.1-204.1.

- Two years for the Virginia False Advertising Act.  *Parker-Smith* v. *Sto Corp.*, 551 S.E.2d 615, 619 (Va. 2001).

- Two years for Virginia Wrongful Death/Survival Actions.  Va. Code Ann. § 8.01-244.

2.   Accrual of Claims

With the expiration framework in place, I turn to the issue

---

[12] In Count 11, Plaintiffs allege a violation of the "Michigan State Law Deceptive Trade Practice" and cite to Mich. Comp. Laws § 445.903 *et seq.*  Plaintiffs' citation is actually to the Michigan Consumer Protection Act, and finding no "Michigan State Law Deceptive Trade Practice" Act, I have applied the Michigan Consumer Protection Act statute of limitations.

of when Plaintiffs' claims accrued.  "The determination of when a cause of action accrues is generally a question of law." *Cooper Indus., LLC* v. *City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009).  I note that Indiana courts are inclined to construe limitation provisions as "enacted upon the presumption that one having a well-founded claim will not delay enforcing it." *Shideler*, 417 N.E.2d at 283.  "They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Havens* v. *Ritchey*, 582 N.E.2d 792, 794 (Ind. 1991) (quoting *Rohrabaugh* v. *Wagoner*, 413 N.E.2d 891, 893 (Ind. 1980)).

Under Indiana's discovery rule, a cause of action accrues "when a party knows, or in the exercise of ordinary diligence could discover, that . . . an injury had been sustained as a result of the tortious act of another." *Strauser* v. *Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005).  The rule "does not mandate that plaintiffs know with precision the legal injury that has been suffered, but merely anticipates that a plaintiff be possessed of sufficient information to cause him to inquire further in order to determine whether a legal wrong has occurred." *Perryman* v. *Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006).  The question is whether "the acts and

circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Id.* (quoting *Mitchell* v. *Holler*, 429 S.E.2d 793, 795 (S.C. 1993)). "Stated more succinctly, the law does not require a smoking gun in order for the statute of limitations to commence." *Id.*

To be sure, the doctrine of fraudulent concealment may toll the statute of limitations in certain circumstances. But "the affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation." *Study* v. *State*, 24 N.E.3d 947, 956 (Ind. 2015) (quoting *Olcott Int'l. & Co., Inc.*, v. *Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1072 (Ind. Ct. App. 2003)).

Examining the operative Second Amended Complaint, I can identify three types of harm alleged for purposes of accrual of claims. I consider at what point in time claims would have accrued in Indiana, using Indiana standards. Of course, statutes from Florida, Kentucky, Michigan, Nevada, North Carolina, Pennsylvania, and Virginia are still theoretically in play, since I have left to the side the question of whether any of these statutes cover claims originating at common law.

However, none of these states would apply a discovery rule substantially more plaintiff-friendly than Indiana's.[13]

---

[13] Florida law is at most no more generous to Plaintiffs than Indiana law.  The Florida Supreme Court has said the delayed discovery doctrine "generally provides that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action."  *R.R. v. New Life Cmty. Church of CMA, Inc.*, 303 So. 3d 916, 921 (Fla. 2020) (citation omitted).  The Florida discovery rule only has a statutory basis for claims of fraud, products liability, professional and medical malpractice, and intentional torts based on abuse.  *Id.*

Kentucky's discovery rule mirrors Indiana's.  *Fluke Corp.* v. *LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010) ("[A] cause of action will not accrue until the plaintiff discovers (or in the exercise of reasonable diligence should have discovered) not only that he has been injured, but also that this injury may have been caused by the defendant's conduct.")

The Michigan Consumer Protection Act is no more generous than Indiana in terms of discovery; it provides that an action "must not be brought more than 6 years after the occurrence of the method, act, or practice that is the subject of the action or more than 1 year after the last payment in a transaction involving the method, act, or practice that is the subject of the action, whichever period of time ends at a later date."  Mich. Comp. Laws § 445.911(9).

The Nevada Deceptive Trade Practices Act mirrors Indiana's discovery rule by providing that "the cause of action shall be deemed to accrue when the aggrieved party discovers, or by the exercise of due diligence should have discovered, the facts constituting the deceptive trade practice."  Nev. Rev. Stat. § 11.190(2)(d).

The North Carolina Deceptive Trade Practices Act provides simply that claims must be brought within four years of accrual.  N.C. Gen. Stat. § 75-16.2.  In general, "this statute commences when the violations actually occur."  *Wood* v. *S. Carolina Bank & Trust Co. of the Piedmont, N.A.*, No. 3:11-CV-00300, 2012 WL 395318, at *2 (W.D.N.C. Feb. 7, 2012).  "However, when the violation of the statute arises out of fraud, the statute of limitations does not accrue until the unfair or deceptive act is discovered or should have been discovered," which mirrors the Indiana discovery rule.  *Id.*

Pennsylvania's discovery rule is comparable to Indiana's.  The limitations period may not begin "until the discovery of the

   a.   *Harm Caused by Law Dosing and Contamination*

The first type of harm is said to be caused by some combination of low dosing and contamination.  Both low dosing and contaminated doses are alleged to have begun in 2009.  *See* SAC at ¶¶1, 2, 6, 8, 9, 11-15, 17, 18, 20, 22, 24.  The allegations describe news coverage in 2009 about the viral contamination, SAC at ¶55, Genzyme's public communications about the shortage, *id.* at ¶207, ¶239, ¶273, and communications about non-viral contaminants, *id.* at ¶171.  Thus, Plaintiffs' claims accrued by the end of 2009.  This is well before the filing of the *Hochendoner* case in the Western District of Pennsylvania on

---

injury is reasonably possible." *Miller* v. *Ginsberg*, 874 A.2d 93, 97 (Pa. 2005) (quoting *Dalrymple* v. *Brown*, 701 A.2d 164, 167 (Pa. 1997)).

   The Virginia Consumer Protection Act is no more generous than Indiana law; it provides that "the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property."  Va. Code Ann. § 8.01-230; *see* Va. Code Ann. § 59.1-204.1.  However, "claims for violation of the Consumer Protection Act that are based upon any misrepresentation, deception, or fraud shall be deemed to accrue when such fraud is discovered or by the exercise of due diligence reasonably should have been discovered." *Skibinski* v. *Lunger,* No. 06-152, 2006 WL 1571820, at *3 (Va. Cir. Ct. June 7, 2006); *see* Va. Code. Ann. § 8.01-249.  Wrongful death/survival actions must come within two years after death of the injured person.  Va. Code Ann. § 8.01-244(B).  The limitations period for false advertising is based on the "catch-all" provision and does not specify a discovery rule. *See Parker-Smith* v. *Sto Corp.*, 551 S.E.2d 615, 619 (Va. 2001); Va. Code Ann. § 8.01-248.

March 9, 2011, when a subset of plaintiffs asserted claims based on low dosing and contamination.

        b.   *Harm Caused by Sensitization*

     The second type of harm is that identified by the Court of Appeals in *Hochendoner II*, 823 F.3d at 733-35; the sensitization harm asserted by Mr. Mooney.  That harm is alleged to have arisen for some plaintiffs upon return to a full dose.  It applies for three named Plaintiffs: Trina Wilkins, Tom Stanziano, and Damon LaForce (and also Mr. Stanziano's wife, who brings a derivative action for loss of consortium).  *Id.* at ¶¶1, 14, 20, 118-19.  Their return to full dosage was in 2012, so accrual would have been by no later than the end of that year.

        c.   *Harm Caused by Fraud*

     The third type of harm concerns fraud.  These allegations derived from the 2009 contamination.  SAC at ¶128-340, 441-71.  Thus, there is a fair argument that plaintiffs should have been aware of this injury by the end of 2009.[14]  I acknowledge that,

---

[14] I note here that plaintiffs include in their complaint internal communications from Genzyme that are quite damning and show efforts to conceal information.  *See, e.g.*, SAC ¶220, ¶229 (showing Genzyme executive wrote to employee "Did we lie to the [Fabry Stakeholders Working Group?]," a group of physicians and patient advocates from which Genzyme sought endorsement).  The information being actively concealed, however, was not about contaminants or vesivirus — or even the limited effectiveness of low-dose Fabrazyme.  Rather, the information being actively concealed was the likelihood of an extended delay before full doses would be available.  The studies discussed in the complaint were publicly available, and it would have been

31

with fraud as alleged, Plaintiffs may have had a more difficult
time recognizing the harm.  Nevertheless, even allowing
Plaintiffs the benefit of a generous reading of the doctrine of
fraudulent concealment, their claims would have accrued by the
time the *Hochendoner* complaint was filed in the Western District
of Pennsylvania on March 9, 2011.  In that complaint it was
alleged that Genzyme "expressly or impliedly misrepresent[ed]
that the reduced dose of Fabrazyme® was in accordance with
statutory mandates and efficacious for use," and "instructed
and/or through knowledge and consent reduced the dose of
Fabrazyme® to dangerous, sub-efficacious and unapproved levels."
Compl. ¶¶ 71(f), 83(k), *Hochendoner* v. *Genzyme Corp.*, No. 2:11-
cv-00313 (W.D. Pa. Mar. 9, 2011), ECF No. 1.

   *d. Summary*

  To synthesize these conclusions, for purposes of Indiana
law, the low-dose/contaminant-based claims and fraud-based

———————————

obvious that a lower dose was sub-optimal.  Plaintiffs make only
passing mention of harm coming from this concealment.  They say
in the body of their complaint that "[h]ad the true information
about the supply situation been provided to [them] and their
doctors, they would have acted with great urgency in September,
2009 to seek alternative treatment, such as Replagal®, through a
compassionate use exemption or additional Fabrazyme through
private arrangements with other patients and doctors."  SAC
¶299.  But they do not otherwise substantiate this point beyond
that conclusory allegation.  They do not describe advice from
their doctors or any efforts to obtain a compassionate use
exemption that were reconsidered because of Genzyme's
statements.

claims likely expired by the end of 2011 and certainly by March 2013.  The sensitization claims appear to have expired by the end of 2014.  The fraud claims conceivably expired by the end of 2011 and certainly by March 2013.

Turning to consider statutes of other states, any low-dose/contaminant-based claims or fraud-based claims under:

- The Florida Deceptive and Unfair Trade Practices Act likely expired by the end of 2013 and certainly by March 2015.

- The Kentucky Products Liability Act likely expired by the end of 2012 and certainly by March 2013.

- The Kentucky Consumer Protection Act likely expired by the end of 2011 and certainly by March 2013.

- The Michigan Product Liability Act likely expired by the end of 2012 and certainly by March 2014.

- The Michigan Consumer Protection Act likely expired by the end of 2015 and certainly by March 2017.

- The Nevada Deceptive Trade Practices Act likely expired by the end of 2013 and certainly by March 2015.

- The Pennsylvania Consumer Protection Act likely expired by the end of 2015 and certainly by the end of March 2017.

- The Virginia Consumer Protection Act likely expired by the end of 2011 and certainly by the end of March 2013.

- The Virginia False Advertising Act likely expired by the
  end of 2011 and certainly by the end of March 2013.

As for sensitization, I observe Ms. Wilkins is alleged to
be a resident of both Kentucky as well as Indiana.  Her Kentucky
Product Liability claim expired by the end of 2013.  And her
Kentucky Consumer Protection claim expired by the end of 2014.
The other relevant individuals are Mr. LaForce, who was a
Virginia resident during low-dose treatment, and Mr. Stanziano
and his wife, who are both Florida residents.  SAC at ¶¶ 14, 20,
21.  Mr. LaForce's claims under the Virginia Consumer Protection
Act and the Virginia False Advertising Act would have expired by
the end of 2014.  Mr. Stanziano's claim under the Florida
Deceptive and Unfair Trade Practices Act would have expired by
the end of 2016.  And any derivative claim for loss of
consortium by his wife, Wendy Stanziano, would have expired by
the end of 2016 as well.

Lastly, the Virginia Wrongful Death/Survival actions raised
by Eddie Viers and Jeanne Wallace do not fit neatly into the
paradigm just employed for the other claims.  *See* SAC at ¶¶ 22,
24.  As noted, these claims must be raised within two years of
the deceased's death.  The complaint specifies that Mr. Viers
lost his wife Teresa Viers in September 2019.  There is no
information about when Ms. Wallace's husband Joseph Wallace
died.  Based on this information, the complaint is insufficient

34

as to Ms. Wallace's claim.  However, Mr. Viers' claim would have
accrued in September 2019 and he would have until September 2021
to bring a claim – a deadline he met, since this lawsuit was
filed in February 2020.  Thus, Mr. Viers has the only claim for
Wrongful Death Survival not barred under a statute of limitation
enforced by Indiana.

> 3.   *American Pipe* Tolling

On a different front, Plaintiffs and Genzyme debate the
applicability of the Supreme Court's *American Pipe* tolling
doctrine, which preserves the claims of putative class members
when a class action is filed in court.  *See generally American
Pipe & Const. Co.* v. *Utah*, 414 U.S. 538 (1974).  Although this
debate is interesting, the parties overlook an important
consideration.  *American Pipe* does not by its terms apply where
a court sits in diversity, presiding over state law claims, as I
do now.  *See Casey* v. *Merck & Co.*, 653 F.3d 95, 100 (2d Cir.
2011), *certified question answered*, 283 Va. 411, 722 S.E.2d 842
(2012).  Accordingly, to determine the applicability of *American
Pipe* tolling, I must consider whether the relevant state courts
have adopted this doctrine, in addition to whether the doctrine
itself fits with the facts.  Moreover, I must consider whether
the relevant states would be likely to adopt cross-
jurisdictional tolling – that is, whether they would recognize

any relevant tolling for a class action filed outside of the
state's courts.   *Id.*

At the outset, I am of the view that *American Pipe* tolling
is a poor fit for the facts of this case, even assuming the
doctrine applies.   The doctrine has continued to introduce
questions as different issues arise in class action litigation.
The First Circuit has acknowledged relatively recent Supreme
Court clarification that "[w]hile a putative class member may
join an existing suit or file an individual action upon denial
of class certification, a putative class member may not commence
a class action anew beyond the time allowed by the untolled
statute of limitations."   *In re Celexa & Lexapro Mktg. & Sales
Pracs. Litig.*, 915 F.3d 1, 16 (1st Cir. 2019) (citing *China
Agritech, Inc.* v. *Resh*, 138 S. Ct. 1800, 1807 (2018)).   The
First Circuit has even more recently extended this reasoning,
holding that the Supreme Court in *China Agritech* "effectively
ruled that the tolling effect of a motion to certify a class
applies only to individual claims, no matter how the motion is
ultimately resolved."   *Id.* at 17.   At least one district court
outside the First Circuit has found this reasoning compelling.
*See Torres* v. *Wells Fargo Bank, N.A.*, No. CV 17-9305 DMG (RAOx),
2019 WL 7169790, at *8 (C.D. Cal. Sept. 27, 2019).

In this case, Plaintiffs argue the class claims have been
tolled.   But that is directly at odds with *In re Celexa*.   I am,

36

**036**

of course, not directly bound by the First Circuit on this
issue, but I have no reason to believe Indiana's courts would
employ *American Pipe* tolling here.

The state law component to this equation gives all the more
reason to doubt that Plaintiffs can rely on *American Pipe*.  It
appears that "[m]ost states, following the Supreme Court's
reasoning in *American Pipe*, have adopted a rule allowing tolling
during the pendency of a class action filed in their own
courts."  *In re Fosamax Prod. Liab. Litig.*, 694 F. Supp. 2d 253,
258 (S.D.N.Y. 2010), *aff'd sub nom. Casey* v. *Merck & Co.*, 678
F.3d 134 (2d Cir. 2012).  But "[o]nly a small fraction of states
have addressed the cross-jurisdictional tolling issue . . . and
there is no clear consensus among them."  *Id.*  "Recognizing the
lack of consensus on the issue and the frequently articulated
concern of forum shopping, federal courts generally have been
disinclined to import cross-jurisdictional tolling into the law
of a state that has not ruled on the issue."  *Id.*

Although the lower Indiana appellate court has adopted
*American Pipe*-style tolling as a matter of state law, *Ling* v.
*Webb*, 834 N.E.2d 1137, 1141-42 (Ind. Ct. App. 2005), Indiana
courts have not explicitly adopted cross-jurisdictional tolling,
*see In re Vioxx Prod. Liab. Litig.*, 2007 WL 3334339, at *6.  For
that reason, federal courts have been wary of assuming Indiana
would recognize such tolling.  *See id.; see also Shea* v. *Gen.*

*Motors LLC*, 567 F. Supp. 3d 1011, 1022 (N.D. Ind. 2021); *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1082 (D. Kan. 2009). *But see In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 349 (E.D. Pa. 2004) (holding Indiana courts likely would observe cross-jurisdictional tolling for an antitrust claim).

Given this context and the fact that the doctrine seems inappropriate in this circumstance, in any event, I find *American Pipe* tolling unavailable for plaintiffs.

4.   Tolling Agreement

Plaintiffs also contend their claims are preserved by a tolling agreement.  The parties entered into an agreement on May 17, 2017[15] that provides:

> [a]ny applicable statutes of limitations pertaining to any matters asserted in the [*Hochendoner* and *Adamo* lawsuits] shall be tolled during the term of this Agreement beginning on [May 17, 2017], and Genzyme agrees it will not assert any defense of statute of limitations, laches or any similar defense based upon the passage of time during the term of this Agreement against the Plaintiffs or members of the putative class alleged in the Lawsuits.

Tolling Agreement, Mot. for Third Amended Compl., ECF No. 105-1, Ex. A.

Plaintiffs say this language saves them, but Genzyme points to the next sentence, which says that "[n]otwithstanding the foregoing, Genzyme does not waive and expressly reserves the

---

[15] Notably, this date falls after the expiration of all the claims as found above, except for a wrongful death claim.

38

**038**

right to assert any such defense based upon the passage of time
*prior to* the effective date of this Agreement or the passage of
time *after* the termination of this Agreement." *Id.* (emphasis
supplied).

This contention presents me with a question of contract
interpretation, as to which I turn to Indiana choice-of-law
principles. In Indiana, "[t]he court will consider all acts of
the parties touching the transaction in relation to the several
states involved and will apply as the law governing the
transaction the law of that state with which the facts are in
*most intimate contact*." *Nat'l Union Fire Ins. Co. of
Pittsburgh, PA* v. *Standard Fusee Corp.*, 940 N.E.2d 810, 814
(Ind. 2010) (emphasis in original) (quoting *W.H. Barber Co.* v.
*Hughes*, 63 N.E.2d 417, 423 (Ind. 1945)). There are five types
of contact Indiana courts consider: "(1) the place of
contracting; (2) the place of negotiation of the contract; (3)
the place of performance; (4) the location of the subject matter
of the contract; and (5) the domicile, residence, nationality,
place of incorporation and place of business of the parties."
*Id.* Because none of these contacts applies here, and indeed
there is no apparent state with the "most intimate contact" –
this dispute being one that involves plaintiffs from many
different states – I apply Indiana law.

Under Indiana law, "[c]onstruction of the terms of a written contract is a pure question of law for the court." *Peoples Bank & Tr. Co.* v. *Price*, 714 N.E.2d 712, 716 (Ind. Ct. App. 1999). "If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument," but if "a contract is ambiguous or uncertain, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder." *Id.* In general, "it is . . . appropriate to construe an ambiguous agreement against its drafter." *Trinity Homes, LLC* v. *Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006). Further, I "should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties." *Price*, 714 N.E.2d at 717. "The contract is to be read as a whole when trying to ascertain the intent of the parties." *Id.* I "must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting." *Id.*

I find as an initial matter the tolling agreement unambiguously preserves the claims that Plaintiffs made in the *Hochendoner I* litigation. The contract plainly says that "[a]ny applicable statutes of limitations pertaining to any matters asserted in the [*Hochendoner* and *Adamo* lawsuits] shall be tolled

during the term of this Agreement."  On its face I take this language to preserve Plaintiff's claims.

True, the next sentence says that "notwithstanding the foregoing" Genzyme still has "the right to assert any [timeliness] defense based upon passage of time prior to the [May 17, 2017]."

But I must read the contract as a whole.  The agreement also says that "[t]he parties desire to provide for additional time to allow them to complete the process of finalizing documentation giving effect to that agreement in principle." And the agreement recites that the parties' agreement is in part "to facilitate the orderly settlement and resolution of the Plaintiffs' claims."  *Id.*

For these provisions to exist in harmony, it would make no sense for the sentence that Genzyme highlights to drain the prior sentence of all meaning.  Genzyme's emphasized sentence makes sense as a clarification that the agreement does not save any claims not already made.  But by the same token the sentence reads naturally as a preservation of the claims that Plaintiffs already made in litigation, since that meaning is the one that would facilitate negotiations between the parties.

Accordingly, I find the tolling agreement preserves Plaintiffs' claims.  It is then an open question the exact extent of what is preserved and what Plaintiffs are allowed to

argue in a new action reliant on this tolling agreement.  I
address this issue *infra* in subsection IV.B.6.

> 5.  Indiana Journey's Account Statute

I turn meanwhile to Indiana's Journey's Account statute,
which Plaintiffs say is of further help in saving their claims.
This statute preserves claims after a lawsuit is dismissed in
certain circumstances.  The lawsuit cannot have been dismissed
for "negligence in the prosecution of the action," Ind. Code §
34-11-8-1(a)(1), and the new lawsuit must be filed within three
years after the prior action failed, *id.* § 34-11-8-1(b)(1).  "It
is well settled that in order for the saving power of the
[Journey's Account Statute] to apply, the decision ending the
previous suit must not have been a decision on the merits."
*Allen* v. *State*, 30 N.E.3d 1280, 1283 (Ind. Ct. App. 2015).
Overall, "[t]he Journey's Account Statute is designed to ensure
that the diligent suitor retains the right to a hearing in court
until he receives a judgment on the merits. Its broad and
liberal purpose is not to be frittered away by narrow
construction."  *Vesolowski* v. *Repay*, 520 N.E.2d 433, 434 (Ind.
1988).

Genzyme argues that statute cannot apply because *American
Pipe* tolling doctrine makes clear that the right to file a new
class action cannot be tolled.  But *American Pipe* tolling is
irrelevant to the current question.  Indiana's statute is its

own independent method by which claims might be preserved.
Indeed, the statute has been used by a federal court in Indiana
to preserve class claims.  *Leathermon* v. *Grandview Mem'l
Gardens, Inc.*, No. 4:07-CV-137-SEB-WGH, 2011 WL 2445980, at *10
(S.D. Ind. June 15, 2011).

Thus, I move forward and inquire whether Plaintiffs' suit
would satisfy these requirements.  Plaintiffs do not seem to
argue that the statute operated independently to allow for them
to file this suit; they acknowledge that they "had three years
to file a new action" and that the tolling agreement was signed
not long before the statute would have lapsed.  [*See* Opposition
to Motion to Dismiss at 9, ECF No. 108]  Specifically, the
*Hochendoner/Adamo* suit was dismissed with respect to the current
Plaintiffs on May 23, 2016, when the First Circuit released its
ruling in *Hochendoner II*.  *See* 823 F.3d at 724.  The tolling
agreement was signed on May 17, 2017.  The window for the
Journey's Account Statute to operate on its own closed on May
23, 2019.  And the lawsuit now before me was filed on February
29, 2020.

The exact role then of the Journey's Account Statute in
Plaintiffs' argument is unclear.  Plaintiffs argue that Genzyme
seeks for me to deprive them of "the protection of Indiana's
savings statute and the parties' tolling agreement."  Their best
theory is seemingly that the statute helped to keep their claims

43

**043**

alive after the dismissal and the tolling agreement locked them
in.  I see no Indiana caselaw on the interaction between tolling
agreements and this statute, so I am reluctant to wade into
uncharted, state-patrolled legal waters.  I note that Indiana
courts have said the statute "is not an exception to the statute
of limitations; it merely allows the continuation of a previous
suit filed within the statute of limitations."  *Hayes* v.
*Westminster Village N., Inc.*, 953 N.E.2d 114, 118 (Ind. Ct. App.
2011).  This characterization makes the statute seem less like a
broad tolling device and more like a specific mechanism to allow
claims to move forward when a suit has been filed.

Even so, to evaluate Plaintiffs' arguments thoroughly, I
now will consider how the new complaint maps onto the prior
action and whether it would seem like a permissible extension,
timing aside.  First, I address the requirement that there be no
negligence in the prosecution of the action.  "Examples of
conduct which would likely be deemed negligence in prosecuting a
case presumably include dismissal for failure to prosecute,
dismissal for failure to comply with the discovery rules,
failure to pay filing fees, and naming the wrong party."
*Dempsey* v. *Belanger*, 959 N.E.2d 861, 866 (Ind. Ct. App. 2011).
"The Journey's Account Statute's typical use is to save an
action filed in the wrong court by allowing the plaintiff enough

time to refile the same claim in the correct forum." *Al-Challah*
v. *Barger Packaging*, 820 N.E.2d 670, 672 (Ind. Ct. App. 2005).

Next, I consider the nexus needed between the prior claim
and the new one.  The Indiana Supreme Court has emphasized that
"[a] plaintiff invoking the benefit of the [Journey's Account
Statute] is not required to prove the second complaint is a
'continuation' of the first." *Eads* v. *Cmty. Hosp.*, 932 N.E.2d
1239, 1245 (Ind. 2010).  "The two *must assert fundamentally the
same claim*, but whether one suit is a 'continuation' of another
is the result of meeting the test of subsections, (a) and (b),
not the cause."[16]  *Id.* (emphasis added).

In *Eads*, the plaintiff sought to bring a medical
malpractice claim after previously bringing a general negligence
claim.  *Id.*  In finding the two were "fundamentally the same
claim," the court noted that "[b]oth complaints allege[d]
identical historical facts and assert[ed]" the same basis for a
claim, specifically the hospital's failure to ensure the
plaintiff had "a safe means of egress."  *Id.*  The court also
observed that "the source of a medical malpractice claim" was
also "basic tort law" and "[t]here [were] no more legal elements

---

[16] As I have earlier observed in this memorandum, part (a) of the
statute establishes the requirement that the plaintiff was
unsuccessful in the earlier action on the basis of a cause other
than negligence in the prosecution.  Ind. Code § 34-11-8-1.
Part (b) establishes when the new action may be brought.

to [the malpractice claim] than there [were] to other negligence torts."  *Id.* at 1246 (quoting *Burke* v. *Capello*, 520 N.E.2d 439, 441 (Ind. 1988), *overruled in part by Vergara* v. *Doan*, 593 N.E.2d 185 (Ind. 1992)); *see also Land* v. *Int'l Bus. Machs. Corp.*, 108 F. Supp. 3d 632, 648-49 (S.D. Ind. 2015) (finding continuation permissible where complaint was "altered" only to name state entities as defendants, a procedural requirement).

The scenario in *Eads* may be contrasted with another case in which the parties changed and elements of the different claims – a 42 U.S.C. § 1983 claim versus gross negligence – were demonstrably distinct.  *Eads*, 932 N.E.2d at 1246 (citing *McGill* v. *Ling*, 801 N.E.2d 678 (Ind. Ct. App. 2004)); *see also Sutton* v. *Scott*, 732 F. App'x 482, 483 (7th Cir. 2018) (Mem.) (finding "suit against the United States [that] sought to rescind [a] forfeiture" was "not remotely the 'same claim'" as "a tort action against one's lawyers," who were being sued for their representation earlier concerning the forfeiture).

I find that the operative Second Amended Complaint before me is close to satisfying the requirements of the Journey's Account Statute (except for the timing component), but I also find that it differs from that statute's customary function.  On the one hand, most of the claims are the same and use the same elements.  But on the other hand, entirely new causes of action have been added (wrongful death/survival; fraud; fraudulent

46

**046**

concealment; breach of fiduciary duty; unjust enrichment), and the facts have been substantially enhanced.

###### 6.   What Is Preserved

As a general proposition, I have found preserved by the Tolling Agreement Plaintiffs' claims from the *Hochendoner I* litigation — with a possible assist from Indiana's Journey's Account Statute.  Thus the question becomes what claims were actually preserved.  Unfortunately, this issue was not addressed in the briefing.

The key phrase is in the tolling agreement: "[a]ny applicable statutes of limitations pertaining to any matters asserted in" the prior lawsuits.  The narrowest reading of this phrase is that precisely the same claims can be brought as were asserted in the prior action.  A slightly more expansive interpretation — one consonant, to my mind, with the type of continuation envisioned by Indiana's Journey's Account Statute — is that the same fundamental claims can be brought, with modifications that address flaws in the earlier action.  A more liberal reading than these initial two interpretations may be possible, also.  The phrase reads "any *matters* asserted" in the prior lawsuit.  "Matters" could refer not simply to specific claims but more broadly to the conduct discussed.  This interpretation could open the door to new causes of action that still focus on the same issues as in the earlier suit.

47

**047**

Given this array of possible meanings, I draw again on Indiana's principles for contract interpretation and find that the meaning on this point is ambiguous.  Thus, I am to consider extrinsic evidence that would shed light on the parties' agreement, but the current pleadings do not provide any extrinsic evidence.  I conclude then that the meaning of this part of the tolling agreement would be a factual issue in dispute, to be resolved at a later stage in this litigation, with implications for the claims that may be ultimately successful.  *See Banknorth, N.A.* v. *BJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283, 285-86 (D. Me. 2005) (explaining that although the defendant may raise meritorious arguments, "they require factual determinations more appropriately made at summary judgment or trial" and not on a motion to dismiss).

**B.   *Standing***

As the First Circuit advised in an earlier stage of this litigation, "[t]he heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." *Hochendoner II*, 823 F.3d at 731.  For this case, injury and causation are most pertinent.

The injury must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List* v. *Driehaus*, 513 U.S. 149, 158 (2014) (citations and quotations omitted).  As the First Circuit explained in

48

**048**

addressing Plaintiffs' prior action, "concrete" means the injury "actually exist[s]" and "particularized" means a plaintiff has experienced harm "in a personal and individual way." *Hochendoner II*, 823 F.3d at 731 (quoting *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 339 (2016)).  Where, as here, plaintiffs allege a variety of injuries and "causal chains," the standing doctrine requires specific allegations "linking each plaintiff to each of these injuries." *Id.* at 733.  Although all alleged injuries may flow from the same set of facts, "a plaintiff who has been subject to injurious conduct of one kind" does not "by virtue of that injury" hold "the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum* v. *Yaretsky,* 457 U.S. 991, 999 (1982).

For causation, a plaintiff must show that her injury is "fairly traceable to the challenged conduct of the defendant." *Sopkeo*, 578 U.S. at 338.  This "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." *Katz* v. *Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012).  The connection "cannot be overly attenuated." *Donahue* v. *City of Boston*, 304 F.3d 110, 115 (1st Cir. 2002).  "Because the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party." *Katz*, 672 F.3d at 71-72.

49

**049**

Although Plaintiffs embellish their pleadings from their initial suit in an attempt to establish standing, they are unsuccessful, with the exception of four Plaintiffs.  Overall, Plaintiffs improve on showing particularized harm compared with *Hochendoner/Adamo*, but none of the harm they successfully show is fairly traceable to misconduct by Genzyme (again with the exception of four Plaintiffs).  And other harm they allege fails because it is speculative or insufficiently alleged.

1.   <u>Theories of Harm</u>

I can discern five theories of injury in the Second Amended Complaint:

a.   *Acceleration Theory*

The first is an acceleration theory.  This theory posits that patients received defective Fabrazyme that caused Plaintiffs' Fabry symptoms to worsen at a faster pace than would have occurred with proper Fabrazyme.  This theory is analogous to the acceleration theory in the *Hochendoner/Adamo* action. This harm is alleged for almost every Plaintiff.  For each of these Plaintiffs, the complaint says the Plaintiff's "clinical status has deteriorated as the Fabry disease has accelerated due to the defective Fabrazyme treatment as evidenced by the occurrence, progression, and exacerbation of at least the following physical injuries, symptoms, and diagnostic criteria." *See, e.g.*, SAC at ¶¶1-2.  What follows then is a laundry list of

ailments.  These allegations do not specify what is meant by "defective Fabrazyme."  The surrounding sentences refer both to low dosing and vesivirus-contaminated Fabrazyme.

> b.   *Sensitization Theory*

The second is a sensitization theory.  This theory posits that some Plaintiffs (Ms. Wilkins, Mr. LaForce, and Mr. Stanziano) became sensitized from low doses of Fabrazyme and consequently experienced dangerous reactions upon returning to full doses.  *See id.* at ¶¶1, 14, 20.  This theory is analogous to the theory found successful for Mr. Mooney in the *Hochendoner/Adamo* action.  *See Hochendoner II*, 823 F.3d at 734-36.

> c.   *Vesivirus Theory*

The third is a vesivirus theory.  This theory posits that the presence of vesivirus in the Fabrazyme doses given to Plaintiffs caused "vesivirus-induced vesiculating non-anaphylactic rashes," as well as an increased "risk of developing fulminating vesivirus infection, and vesivirus induced hematological cancer."  *See, e.g.*, SAC at ¶1-2.  This theory is applied to almost every Plaintiff.  Plaintiffs allege generally that Genzyme contaminated its bioreactors – containers similar to fermentation tanks that are used to produce Fabrazyme – with vesivirus at some point before July 2009.  *Id.* at ¶42.  Genzyme named the particular strain of vesivirus "2117

(Allston)" for the manufacturing facility where it was detected (Allston, Massachusetts).  *Id.* at ¶47.

        d.   *Life Expectancy Theory*

The fourth is a life expectancy theory.  This theory posits that low doses of Fabrazyme decreased Plaintiffs' life expectancy.  *See, e.g., id.* at ¶¶1-2.  This theory is also applied to almost every Plaintiff.

        e.   *Financial Theory*

The fifth is a financial theory.  This theory posits that Plaintiffs spent money on medically worthless medication, worthless "because it was ineffective for treating Fabry disease and unsafe to administer at the dosage and purity which it was sold."  *See, e.g., id.* at ¶¶1-2.  This theory is also applied to almost every plaintiff.

    2.   Success of the Five Theories of Harm

I now address whether any of the five theories of harm satisfy the requirements of constitutional standing.  Like the Court of Appeals in *Hochendoner II*, I find that only the sensitization theory succeeds.

The acceleration theory fails for insufficiently showing causation.  Plaintiffs' allegations repeatedly refer to "defective" Fabrazyme without specifying whether the problem was dosage or contaminants, a failure which undermines Plaintiffs'

claims.  Plaintiffs' open-ended pleading fails to make meaningful allegations of causal ties.

Moreover, there is no information to corroborate that any Plaintiff received a dose contaminated with vesivirus; the link to be drawn is apparently that Genzyme reported vesivirus at its plant and Plaintiffs experienced symptoms they claim — with no particularized allegation — resulted from contamination. Although the Second Amended Complaint describes distressing ailments suffered by numerous patients and attempts to connect them to "defective" doses of Fabrazyme, it does not for any Plaintiff provide information to show that the symptoms experienced were the result of "defective" dosing and not simply the progression of Fabry disease as would have occurred without the drug and perhaps even at a faster pace.  There is no information from a physician about symptoms or a comparison with symptom progression before "defective" doses.

The Second Amended Complaint does reference research from Europe showing that acceleration can occur and that "Europe banned 'low-dosing' entirely and required Genzyme Corporation to change the label to warn patients of possible acceleration of the Fabry-disease process."  SAC ¶98-99.  And the Second Amended Complaint states for various Plaintiffs that they have experienced an acceleration of symptoms due to "defective" doses.  But a study showing that acceleration *can* occur says

nothing of whether Plaintiffs themselves suffered acceleration.
As the First Circuit made clear in the prior iteration of this
suit, "[n]either conclusory assertions nor unfounded speculation
can supply the necessary heft" to establish standing.
*Hochendoner II*, 823 F.3d at 731.  As pleaded, Plaintiffs only
speculate regarding the cause of their injuries.

The vesisvirus theory fails as well for insufficiently
showing causation.  I have explained the weak basis plaintiffs
provide for vesivirus being in a dose they received.
Additionally, the specific symptom they describe for this injury
theory — vesivirus-induced vesiculating non-anaphylactic rashes
— is consistent with known side effects of Fabrazyme.
Plaintiffs simply provide their say-so that these rashes are
from vesivirus.  No plaintiff provides any particularized
allegation of a vesivirus diagnosis or of the virus being
detected in their body.

The vesivirus theory also fails for being too speculative,
and the life expectancy theory fails for this reason, too.  With
the vesivirus theory, the complaint states baldly that vesivirus
exposure has increased the risk of certain health problems for
Plaintiffs.  And with the life expectancy theory, the complaint
states simply that low doses have resulted in a lower life
expectancy.  But Article III standing requires showing harm that
is "actual or imminent, not conjectural or hypothetical." *Susan*

*B. Anthony List*, 573 U.S. at 158 (quoting *Lujan* v. *Defens. of Wildlife*, 504 U.S. 555, 560 (1992)).  These vague prognostications in the operative complaint now before me also are insufficient.

Finally, the financial theory also fails because it is insufficiently pled to show injury.  Plaintiffs spent money on a medication that they knew would come in a lesser quantity than what they usually purchased.  Their only arguments to show the medication was worthless are based on conclusory statements that the doses harmed them in some way.  *See, e.g.*, SAC ¶1.  But again, Plaintiffs do not offer any particularized allegation to show that low doses or a highly speculative contamination of vesivirus caused them harm.  The harm they describe is consistent with the progression of Fabry disease.

Nevertheless, the sensitization theory of standing succeeds, as it did before the First Circuit in *Hochendoner II*. Plaintiffs plausibly allege that "'[l]ow dosing' a protein like Fabrazyme increases the likelihood that Fabrazyme will induce an immune response against Fabrazyme itself because the immune system is more likely to interpret low-dose protein as a pathogen and become hypersensitive to subsequent injections."

SAC ¶104.  As a result, Mr. LaForce, Mr. Stanziano,[17] and Ms.
Wilkins all say they experienced anaphylactic response upon
returning to a full dose.  *Id.* at ¶¶1, 14, 20.  The allegations
here mirror the allegations in the prior suit but with some
specificity.  And Genzyme does not dispute the success of this
theory for the four remaining plaintiffs in their motion to
dismiss.

## IV. CLASS ACTION STATUS

To this point, I have found that the May 2017 tolling
agreement between the parties preserved Plaintiffs' claims – at
least in some form – but that only four Plaintiffs succeed in
establishing standing, and then on a narrow, idiosyncratic basis
(with one of these Plaintiffs doing so with a derivative loss-
of-consortium claim).  To maintain this action as a class action
under Rule 23 requires that the class be "so numerous that
joinder of all members is impracticable."  Fed. R. Civ.
P.23(a)(1).  Genzyme has not challenged whether Plaintiffs
satisfy the numerosity requirements.  But with only four
Plaintiffs who experienced a very specific type of injury, I
have doubts about whether this suit may proceed on a class

---

[17] Mr. Stanziano's wife, Ms. Stanziano, also sues through a
derivative loss-of-consortium claim on a surviving sensitization
claim by Mr. Stanziano.

action basis.[18]  At this point, I will evaluate the claims of
these plaintiffs only on an individual basis.

## V. MERITS

I now must address the claims made by Ms. Wilkins, as a
resident of Indiana and Kentucky, Mr. and Ms. Stanziano, as

---

[18] In *Rovinelli* v. *Trans World Entertainment Corporation* I
had occasion to address a similar, though not identical,
issue:  How and whether to proceed as to state law claims where
"the pleaded matters [were not] properly dealt with through a
class action in federal court."  *See* No. 19-11304-DPW, 2021 WL
752822, at *1 (D. Mass. Feb. 2, 2021).  There I found that the
plaintiffs' allegations did not provide facts demonstrating
"commonality and predominance that are required to adjudicate
claims as a class action under Fed. R. Civ. [P.] 23."  *Id.*  I
explained that the plaintiffs *never* had proper jurisdiction in
federal court pursuant to the CAFA, and I struck the class
allegations.  *Id.* at *13.  I then considered whether I had
subject matter jurisdiction to proceed with respect to
plaintiffs remaining claims, all brought under state law.  *Id.*
I concluded that I would not exercise supplemental jurisdiction
over the state law claims because the "jurisdictional hook" of
the CAFA was improper, and the amount in controversy was
insufficient for the "ordinary diversity of citizenship
analysis."  *Id.* at *16.
  The current matter presents different circumstances.  Genzyme
is a citizen of Massachusetts, whereas the four remaining
Plaintiffs are variously citizens of Indiana, Kentucky, Florida,
and Virginia.  In most Counts, Plaintiffs "demand[ed] judgment
against [Genzyme] in an amount in excess of $75,000.00," and
pleaded both "*individually* and on behalf of all others similarly
situated."  SAC ¶457 (emphasis added).  Although most of
Plaintiffs' allegations containing injuries have been dismissed
for standing, the remaining allegations, if proven, would likely
have damages that could exceed $75,000.00.  Plainly, I cannot
say to a legal certainty that a claim is for less.  *See*
*Stewart* v. *Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004)
(explaining that a plaintiff's allegation of damages "controls"
if it is "made in good faith," since "[i]t must appear to a
legal certainty that the claim is really for less . . . to
justify dismissal" when challenged (quoting *St. Paul Mercury
Indem. Co.* v. *Red Cab Co.*, 303 U.S. 283, 288-89 (1938))).

Florida residents, and Mr. LaForce, as a Virginia resident.
Notably, several of these claims — for fraud, fraudulent
concealment, breach of fiduciary duty, and unjust enrichment –
were not brought in the *Hochedoner I & II* litigation.  I
nevertheless address them here.  As I explained above, however,
whether these claims can be brought is a matter of factual
dispute involving the meaning of the tolling agreement.

I address first whether the heightened pleading standards
of Fed. R. Civ. P. 9(b) should apply and then examine each claim
through the lens fashioned in that manner.  The standing theory
I have found viable – the sensitization theory – is the one
standing theory accepted in *Hochendoner II.*

**A.   *Rule 9(b) Heightened Pleading Standards***

Genzyme contends that all claims in the Second Amended
Complaint "are grounded in allegations of fraudulent,
misleading, or deceptive conduct," and so they must satisfy Rule
9(b)'s heightened pleading standards.

Genzyme also contends that Plaintiffs' "fraud claims are
grounded in the same core theory as the rest of their product
liability claims," and so the fraud claims should be subject to
the two-year statute of applications relevant for product
liability in Indiana.

Plaintiffs apparently agree with Genzyme's Rule 9(b)
contention and point to the First Circuit's instruction that

"Rule 9(b)'s heightened pleading requirements apply not only to claims of fraud simpliciter but also to related claims as long as the central allegations of those claims 'effectively charge fraud.'" *Foisie* v. *Worcester Polytechnic Inst.*, 967 F.3d 27, 49 (1st Cir. 2020) (quoting *Mulder* v. *Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017)).

Considering the theory of harm before me and how it interacts with the causes of action, I find Rule 9(b)'s pleading standards applicable to the denominated fraud claim.  At bottom, though Plaintiffs make many allegations of Genzyme concealing information in their other claims, those claims are fundamentally about product liability and Rule 9(b) does not apply.  I will return to a discussion of the fraud denominated claims in Section V.K. *infra*.

**B.   *Negligence***

The negligence claims asserted by Mr. LaForce and Mr. Stanziano (and derivatively Ms. Stanziano) fail.  *See* SAC at ¶¶350-352.  The negligence claims are brought under theories of products liability.  *See, e.g., West* v. *Caterpillar Tractor Co., Inc.,* 336 So. 2d 80, 84 (Fla. 1976) ("Products liability deals with recourse for personal injury . . .resulting from the use of a product and, in the past, has covered actions for negligence. . . ."). Florida and Virginia both recognize three theories of negligence for products liability cases: negligent design,

negligent manufacture, and negligent failure to warn.[19]  *Powell*
v. *Diehl Woodworking Mach., Inc.,* 198 F. Supp. 3d 628, 633 (E.D.
Va. 2016) ("Virginia law only recognizes three products
liability claims: negligent assembly or manufacture, negligent
design, and failure to warn."); *Ugaz* v. *Am. Airlines, Inc.,* 576
F. Supp. 2d 1354, 1374–75 (S.D. Fla. 2008) ("In Florida, a
product may be defective by virtue of a design defect, a
manufacturing defect, or an inadequate warning.").

"To prove any products liability claim sounding in
negligence, whether negligent design, negligent manufacture, or

---

[19] Plaintiffs seem to allege that Genzyme acted negligently
by "fail[ing] to test or require the testing of the effects of
reducing the dosage of Fabrazyme to unapproved levels."  SAC ¶
351(j.).  Florida and Virginia law do not recognize an
independent negligence theory for failure to test a
product.  *See Horton* v. *Hoosier Racing Tire Corp.,* No. 8:15-cv-
1453-T-17TGW, 2015 WL 12859316, at *4 (M.D. Fla. Dec. 15, 2015)
("Florida courts have refused to recognize an independent claim
for negligent failure to test."); *Powell* v. *Diehl Woodworking
Mach., Inc.,* 198 F. Supp. 3d 628, 633–34 (E.D. Va. 2016)
(explaining the same).  Rather, failure to test allegations
must "fit [] into one of the traditional theories, or [be]
dismiss[ed] [] altogether."  *Powell,* 198 F. Supp. 3d at
634.  Plaintiffs do not plead this claim as a part of a
recognized negligence claim.  Moreover, Plaintiffs do not show
that they received a defective product or that Genzyme did not
test the Fabrazyme they received.  Accordingly, this claim
fails.

Additionally, Plaintiffs seem to allege negligence on the
basis of "negligent[] monitor[ing]" and "negligent[]
marketing."  SAC ¶ 351(l.);(o.).  Setting aside whether Florida
and Virginia law would recognize these theories of liability in
a negligence products liability claim, Plaintiffs have not
stated a claim based on these allegations because Plaintiffs
fail to show causation.

the negligent failure to provide adequate warnings or instructions, a plaintiff must establish (1) that the defendant owed a duty of care toward the plaintiff, (2) that the defendant breached that duty, (3) that the breach was the proximate cause of the plaintiff's injury, and (4) that the product was defective or unreasonably dangerous." *Cooper* v. *Old Williamsburg Candle Corp.,* 653 F. Supp. 2d 1220, 1226 (M.D. Fla. 2009). Plaintiffs cannot meet this burden.

### 1. Negligent Design Theory

A claim for negligent design requires showing a defect in the product caused Plaintiffs' injuries. *Wolicki-Gables* v. *Arrow Int'l, Inc.,* 641 F. Supp. 2d 1270, 1287 (M.D. Fla. 2009); *see Dodson* v. *C.R. Bard, Inc.,* No. 3:20cv596 (DJN), 2020 WL 7647631, at *5 (E.D. Va. Dec. 23, 2020) ("At minimum, [p]laintiff must provide some allegation that a design defect existed and that such a defect proximately caused [p]laintiff's injuries."). Plaintiffs have not clearly alleged a defect. As I have explained, Plaintiffs seem to allege that the Fabrazyme was defective due to contaminants or low dosage, *supra* Section III.B.1.a.; [SAC ¶¶ 2, 8, 351], but the pleadings are unclear and such "[a] bare allegation of a 'defect' is no more than a legal conclusion" that is insufficient to state a claim. *Ball* v. *Takeda Pharms. Am., Inc.,* 963 F. Supp. 2d 497, 505 (E.D. Va. 2013), *aff'd* 587 F. App'x 78 (4th Cir. 2014) (per curiam)

61

(Mem.).  Plaintiffs also fail to plead causation.  Plaintiffs do not demonstrate that they ever took "defective Fabrazyme," and, as a result, cannot show that "defective Fabrazyme" caused their alleged injuries.

### 2.  Negligent Manufacture Theory

The negligent manufacture theory fails along the same lines as the negligent design theory — Plaintiffs do not show a causal connection between the manufacturing defects they allege (contamination) and their relevant injuries (sensitization). *Cooper*, 653 F. Supp. 2d at 1226; Va. Prac. Tort and Personal Injury Law § 15:15 ("[A] plaintiff may not recover for damages in a product liability action absent a legally sufficient causal link between the alleged wrong and the plaintiff's resulting damages.").

### 3.  Failure to Warn Theory

In general, "a manufacturer has a duty to warn its customers of risks posed by its products." *Higgins* v. *Forest Lab'ys*, 48 F. Supp. 3d 878, 884 (W.D. Va. 2014).  The failure-to-warn theory, however, fails in the face of the learned intermediary doctrine, which instructs that a drug manufacturer's duty to warn extends to a patient's physician, but not to the patient, based on the proposition that a physician has the expertise to read warning labels and advise patients.  *See id.* (describing this doctrine in Virginia

62

**062**

courts); *Small* v. *Amgen, Inc.*, 723 F. App'x 722, 724-25 (11th Cir. 2018) (per curiam) (explaining the same under Florida law). Accordingly, a "[p]laintiff must show [it is] more likely than not the warning to the physician was inadequate and the warning did not sufficiently inform the prescribing physician about the risks involved in prescribing the drug." *Chase* v. *Novartis Pharm. Corp.*, 740 F. Supp. 2d 1295, 1297 (M.D. Fla. 2006) (internal quotations omitted) (applying Florida law); *see also Higgins*, 48 F. Supp. 3d at 884-87 (describing doctrine in similar terms for Virginia).

If a physician is independently aware of a risk associated with a medication, then the patient has no claim against the manufacturer, regardless of any warnings provided. *See Higgins*, 48 F. Supp. 3d at 893 (granting summary judgment on failure-to-warn claim on these grounds); *see also Tillman* v. *C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1335 (M.D. Fla. 2015) ("[T]he failure of the manufacturer to provide the physician with an adequate warning is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that an adequate warning should have communicated.").

Plaintiffs' allegations in this matter are thus insufficient to support a failure-to-warn claim. Although Plaintiffs allege that Genzyme "failed to provide adequate warnings, cautions, and directions concerning the dangers and

limitations of the 'low dose' of Fabrazyme" and "expressly and
impliedly misrepresent[ed] that injection with Vesivirus-
containing Fabrazyme is harmless," SAC ¶¶351(k.), they have not
provided any allegation about what their doctors knew or what
they advised, let alone the warnings that Genzyme provided.

**C.    *Negligence Per Se***

Mr. LaForce and Mr. Stanziano (and derivatively Ms.
Stanziano) also make claims for negligence per se.  Mr.
LaForce's claim fails because the relevant provision of Virginia
law he cites, Va. Code Ann. § 54.1-3461 et seq., applies to
adulterated products, while the viable standing theory
identified in *Hochendoner II* is not based on adulteration.  *See*
823 F.3d at 732-33.  The Stanzianos' claims fail because they do
not identify what portions, if any, of Florida law Genzyme
violated.  *See* SAC at ¶352 n.10.  In Plaintiffs' narrative
Opposition to Genzyme's Motion to Dismiss, Mr. Stanziano says
his claim is "based on the violations of the Florida Pure Food
and Drug Acts," but he does so without specifying what provision
of the Florida law Genzyme violated.  Accordingly, the
Stanzianos fail to state a claim because they do not specify
that there was a "violation of a statute which establishes a
duty upon a party to take precautions to protect a particular
class of persons from a particular injury or type of injury."

*Hesterly* v. *Royal Caribbean Cruises, Ltd.,* 515 F. Supp. 2d 1278, 1287 n.6 (S.D. Fla. 2007).

**D.   Strict Liability**

Mr. LaForce's claim for strict liability stumbles at the threshold because, as he admits, Virginia does not permit strict product liability claims.  *See Harris* v. *T.I. Inc.*, 413 S.E. 2d 605, 609-10 (Va. 1992).

The Stanzianos' strict liability claims fail more particularly because any claim based on failure to warn cannot avoid the learned intermediary doctrine, as described above, and they do not demonstrate a causal connection between any alleged defect in the Fabrazyme Mr. Stanziano actually received and his injury.  In Florida, to make a claim against a manufacturer "on the theory of strict liability tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of a *proximate causal connection* between such condition and the user's injuries or damage."  *Siemens Energy & Automation, Inc.* v. *Medina*, 719 So.2d 312, 315 (Fla. Dist. Ct. App. 1998) (emphasis added) (quoting *West* v. *Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976)).

**E.   Breach of Warranty**

<u>1.   Claims for Breach of Implied Warranties</u>

Mr. LaForce and the Stanzianos bring claims for breach of

65

**065**

implied warranties of merchantability or fitness.   SAC ¶362.
The claims for breach of implied warranty of merchantability
fail because Mr. LaForce and the Stanzianos show no defect in
the Fabrazyme actually received.   *See* Fla. Stat. § 672.314
(defining in relevant part that merchantable good is "fit for
the ordinary purposes for which such goods are used"); Va. Code
Ann. § 8.2-314 (same); *see also Egbebike* v. *Wal-Mart Stores E.,
LP*, No. 3:13-cv-865-J-34MCR, 2014 WL 3053184, at *6 (M.D. Fla.
July 7, 2014) (requiring plaintiff to prove that there is a
defect in the product to sustain a claim for breach of implied
warranty of merchantability for defective product under Florida
law).

The Stanzianos' claims for breach of implied warranty of
merchantability and fitness also fail because they do not
adequately allege how Mr. Stanziano was in privity with Genzyme.
*See Cruz* v. *Mylan, Inc.*, No. 8:09-CV-1106T17-EAJ, 2010 WL
598688, at *2 (M.D. Fla. Feb. 17, 2010).   Although the complaint
states Mr. Stanziano "was in privity with Genzyme throughout his
treatment with his Genzyme case coordinator as well as being
registered in the Genzyme sponsored Fabry Registry," the
complaint does not allege that he and Genzyme had a buyer-seller
relationship.   *See id.* ("A plaintiff who purchases a product,
but does not buy it directly from the defendant, is not in
privity with that defendant" (quoting *T.W.M.* v. *Am. Med. Sys.,*

**066**

*Inc.*, 886 F. Supp. 842, 844 (N.D. Fla. 1995).); *cf. id.*
(recognizing exceptions to this rule for express warranties, but
not implied warranties, where a buyer has an extensive
relationship with a manufacturer).

Mr. LaForce's claim for breach of implied warranty of
fitness also fails.  First, Virginia's statute refers
specifically to a "buyer" and a "seller," but Genzyme did not
sell directly to Mr. LaForce.  I do recognize that it is not
completely clear from Virginia caselaw if these facts on their
own bar Mr. LaForce from bringing this claim.  *See Bayliner
Marine Corp.* v. *Crow*, 509 S.E.2d 499, 503 (Va. 1999) (seemingly
not barring on this ground a claim brought by a buyer against a
manufacturer, where purchase was made through an exclusive
dealer).  But second, if the claim is not barred for lack of
direct sales relation, it still would fail because Plaintiffs
must prove that Genzyme "at the time of contracting [had] reason
to know" a "particular purpose for which the goods [were]
required and that [the plaintiffs] [] rel[ied] on [Genzyme's]
skill or judgment to select or furnish" the Fabrazyme.  *See* Va.
Code Ann. § 8.2-315.  Neither Mr. LaForce nor the Stanzianos
have pled this sufficiently because they do not explain how
Genzyme would have perceived their reliance when Genzyme would
necessarily have understood that Fabrazyme patients made
decisions under the care of a physician.

2.   Claims for Breach of Expressed Warranty

The claims for breach of express warranty fail because neither Mr. LaForce nor the Stanzianos trace their injuries to any specified breaches of an express warranty.  The complaint alleges:

> [1] [Genzyme] expressly warranted in the Fabrazyme product insert that Fabrazyme reduces globotriaosylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition; . . .

> [2] [Genzyme] expressly warranted in the Fabrazyme product insert that Fabrazyme is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using 'low dose' for such an indication; . . .

> [3] in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009; . . .

> [4] in expressly and impliedly warranting that a "low dose" of Fabrazyme was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; . . .

> [5] in expressly and impliedly misrepresenting that injection with vesivirus-containing Fabrazyme is harmless, non-immunogenic, without impact on the efficacious treatment of Fabry disease with Fabrazyme, even though no medical testing had ever been undertaken to establish the objective truth of such material medical claims and further concealing previously published medical literature rendering such statements regarding medical safety of vesivirus injection as false.

SAC at ¶¶362(a), 362(b), 362(m), 362(n), 362(q).

Causation is an essential element for a breach of warranty claim. *See* 77A C.J.S. Sales § 484. But the plaintiffs do not show how the breach of any such warranties led to their anaphylactic reactions upon returning to a full dose.

Additionally, with the exception of the third and fifth enumerated items, Plaintiffs do not sufficiently establish that Genzyme made these warranties. I addressed similar allegations in *Hochendoner I* and noted that the language that Plaintiffs cited from the package insert contained "dosing directions, indicating the dosage at which the FDA [had] approved Fabrazyme® and in the context of which the 'Indications and Usage' statement must be read." *Hochendoner I*, 95 F. Supp. 3d at 32. "Nowhere does the package insert state that a lower dosage would be as efficacious for use in the treatment of Fabry disease as the dose recommended on the packaging and by the FDA. Nowhere does the package insert state that a lower dosage is FDA-approved." *Id.*

## F.   *Florida Deceptive and Unfair Trade Practices*

Despite Mr. Stanziano claiming financial injury in addition to personal injury, I have only found viable his standing theory based on personal injury. Thus, the Stanzianos' claims under the Florida Deceptive and Unfair Trade Practices Act fails because the law "expressly states that it 'does not apply to . . . [a] claim for personal injury." *Echols v. RJ Reynolds Tobacco*

69

**069**

*Co.*, No. 13-cv-14215, 2014 WL 5305633, at *5 (S.D. Fla. Oct. 15, 2014) (quoting Fla. Stat. § 501.212(3)) (dismissing claim because damages sought for personal injury).

### G.   *Indiana Product Liability Act and Kentucky Product Liability Act*

Ms. Wilkins' claims under the Indiana Product Liability Act and the Kentucky Product Liability Act fail for reasons similar to those that render the negligence product liability claims of the Stanzianos and Mr. LaForce inadequate.

Like Florida and Virginia, Indiana and Kentucky recognize product liability claims based on manufacturing defects, design defects, and failures to warn.  *See Brewer* v. *PACCAR, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019); *Clark* v. *Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995) (Barker, J.), *overruled on other grounds by Martin* v. *Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009).

A manufacturing defect claim will fail for lack of causation.  *Jarrett* v. *Wright Med. Tech., Inc.*, No. 1:12-cv-00064-SEB-DML, 2021 WL 4307026, at *8 (S.D. Ind. Sept. 22, 2021); *Red Hed Oil, Inc.* v. *H.T. Hackney Co.*, 292 F. Supp. 3d 764, 773 (E.D. Ky. 2017) ("Regardless of the theory a plaintiff pursues, he must show causation in a products liability case.").

As for a design defect claim, like Mr. LaForce and the Stanzianos, Ms. Wilkins does not specify in the Second Amended Complaint a theory of design defect under either Indiana law or

Kentucky law.  Under Indiana law, plaintiffs bringing a products liability claim based on an alleged design defect "must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances of *designing the product*."  *TRW Vehicle Safety Sys., Inc.* v. *Moore,* 936 N.E.2d 201, 209 (Ind. 2010) (emphasis added) (quoting Ind. Code § 34-20-2-2).  Kentucky law requires "establish[ing] existence of an alternative, safer design that is practical under the relevant circumstances."  *Primal Vantage Co., Inc.* v. *O'Bryan,* __S.W.3d__, 2022 WL 3641122, at *12 (Ky. Aug. 18, 2022) (Minton, C.J.).  *But see Kaiser* v. *Johnson & Johnson,* 947 F.3d 996, 1014 (7th Cir. 2020) (explaining that Indiana law does not require proof of an alternative design, though it "can be relevant to design-defect liability").

In her narrative opposition to Genzyme's motion to dismiss her Kentucky claim, Ms. Wilkins does say that she shows a design defect "in that Fabrazyme is a pharmaceutical and therefore Genzyme is strictly liable for the effects of vesivirus and particulates on [her] vesivirus infection and her inflammation and her accelerated disease process."  And she says further "[t]he product was defectively designed in that it was administered at 'low' dose which makes it impossible to treat Fabry disease."  These allegations do not state a claim under either Indiana or Kentucky law.  The first point she makes is

off the mark because what she really alleges is a manufacturing

defect, and in any event that claim fails for causation.  The

second point fails as well because although low-dose Fabrazyme

may be less effective than full dose – as was certainly known to

patients and their doctors – the complaint does not show that

low-dose Fabrazyme "makes it impossible to treat Fabry disease."

The failure-to-warn claims fail because of the learned

intermediary doctrine in both Kentucky and Indiana, in the same

way the claims brought by Mr. LaForce and Mr. Stanziano fail

under Florida and Virginia law.  *See Larkin* v. *Pfizer, Inc.*, 153

S.W.3d 758, 762-770 (Ky. 2004) (describing and adopting the

doctrine); *Ortho Pharm. Corp.* v. *Chapman*, 388 N.E.2d 541, 548

(Ind. Ct. App. 1979) ("[A] manufacturers [sic] duty to warn

extends only to the medical profession, and not the ultimate

users.").

### H.   *Kentucky Consumer Protection Act*

The Kentucky Consumer Protection Act prohibits "[u]nfair,

false, misleading, or deceptive acts or practices in the conduct

of any trade or commerce."  Ky. Rev. Stat. Ann. § 367.170.  To

prove a violation of the Act, a plaintiff must show that they

"(1) purchase[d] or lease[d] goods or services (2) for personal,

family or household purposes and (3) [was] injured as a result

of a seller's prohibited practice or act."  *Simpson* v. *Champion*

*Petfoods USA, Inc.,* 397 F. Supp. 3d 952, 961 (E.D. Ky. 2019)
(Bertelsman, J.).

Genzyme says that Ms. Wilkins's claim under the Kentucky
Consumer Protection Act "fails as a matter of law because [she]
has not sufficiently alleged that she purchased Fabrazyme
directly from Genzyme such that she was in privity with
Genzyme."  Genzyme also says that, even if she did show she was
in privity, her claim would fail because it is inadequately
alleged.

As to the first argument, the Second Amended Complaint says
that Ms. Wilkins "was in privity with Genzyme throughout her
treatment with her Genzyme case care coordinator as well as
being registered in the Genzyme sponsored Fabry Registry."  SAC
at ¶1.  While the complaint does not show explicitly a buyer-
seller relationship, Kentucky allows an exception where
"'express warranties were clearly intended for the product's
consumers,' even if the warranties did not 'expressly state that
they run directly to the intended consumers.'"  *Yonts* v. *Easton
Tech. Prods., Inc.*, 676 F. App'x 413, 420 (6th Cir. 2017)
(quoting *Naiser* v. *Unilever U.S., Inc.*, 975 F. Supp. 2d 727,
739-40 (W.D. Ky. 2013)).  However, this exception does not
extend to implied warranties.  *See Naiser*, 975 F. Supp. 2d at
739 (observing, in deciding to recognize exception to privity
rule involving an express warranty, that the most recent

73

**073**

Kentucky Supreme Court decision not to find an exception involved an implied warranty).

Thus, to the extent this exception applies, Ms. Wilkins might be able to make an argument based on express warranties. But this argument fails based on causation, for the same reasons identified in discussing the warranty claims brought by Mr. LaForce and the Stanzianos. "The breach of the express warranty must have caused the injury," Ky. Prod. Liab. L. § 6:2, which Ms. Wilkins does not demonstrate.

## I.   *Virginia Consumer Protection Act*

Mr. LaForce may not bring a claim under the Virginia Consumer Protection Act, because sales of Fabrazyme are regulated by the U.S. Food and Drug Administration. The Act does not apply to "[a]ny aspect of a consumer transaction which aspect is authorized under laws or regulations of this Commonwealth or the United States, or the formal advisory opinions of any regulatory body or official of this Commonwealth or the United States." Va. Code Ann. § 59.1-199(A). Thus, for example, a federal court has found that plaintiffs could not sue a company for representations made "in advertisements and other marketing materials concerning the safety and effectiveness" of a medical device, because regulations about the device were "authorized and regulated by the FDA under federal law." *Ali* v.

*Allergan USA, Inc.*, No. 12-cv-115, 2012 WL 3692396, at *19 (E.D. Va. Aug. 23, 2012).

## J.   *Virginia False Advertising Act*

Mr. LaForce's claim under the Virginia False Advertising Act fails for the same reason I found inadequate a claim under the Act in *Hochendoner I*.  As I explained there, "[u]nder Va. Code § 59.1-68.3, a plaintiff may bring a claim for losses resulting from an 'untrue, deceptive or misleading' 'promise, assertion, representation, or statement of fact' in an advertisement."  *Hochendoner I*, 95 F. Supp. 3d at 33 n.13 (quoting Va. Code Ann. § 18.2-216).  But Mr. LaForce has not sufficiently "alleged that Genzyme made any untrue or deceptive statements regarding the efficacy of Fabrazyme® at a lower dosage."  *See id.*

## K.   *Fraud and Fraudulent Concealment*

The fraud claims asserted by Mr. LaForce and the Stanzianos fail because they cannot trace the harm they experienced to information that Genzyme is alleged to have withheld intentionally.  I note that here Rule 9(b)'s heightened pleading requirements apply in full force.  *See supra* Section V.A.

The elements of fraud in Florida are: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4)

75

**075**

*consequent injury by the party acting in reliance* on the

representation." *Butler* v. *Yusem*, 44 So. 3d 102, 105 (Fla.

2010) (per curiam) (emphasis added) (quoting *Johnson* v. *Davis*,

480 So.2d 625, 627 (Fla. 1985)).  The elements in Florida for

fraudulent concealment are similar.[20]

In Virginia, a plaintiff bringing a fraud action "bears the

burden of proving by clear and convincing evidence" these

elements: "(1) a false representation, (2) of a material fact,

(3) made intentionally and knowingly, (4) with intent to

mislead, (5) reliance by the party misled, and (6) *resulting*

*damage to the party misled*."  *Richmond Metro. Auth.* v. *McDevitt*

*St. Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998) (emphasis added)

(quoting *Evaluation Rsch. Corp.* v. *Alequin*, 439 S.E.2d 387, 390

(Va. 1994)).  Virginia does not have a separate cause of action

for fraudulent concealment, though "[c]oncealment of a material

fact by one who knows that the other party is acting upon the

assumption that the fact does not exist constitutes actionable

---

[20] A claim for fraudulent concealment in Florida must show (1)
the defendant "concealed or failed to disclose a material fact";
(2) the defendant "knew or should have known the material fact
should be disclosed"; (3) the defendant "knew [its] concealment
of or failure to disclose the material fact would induce the
plaintiffs to act"; (4) the defendant "had a duty to disclose
the material fact"; and (5) "the *plaintiffs detrimentally relied*
*on the misinformation*."  *Hess* v. *Philip Morris USA, Inc.*, 175
So. 3d 687, 691 (Fla. 2015) (emphasis added) (quoting *R.J.*
*Reynolds Tobacco Co.* v. *Martin*, 53 So.3d 1060, 1068 (Fla. Dist.
Ct. App. 2010)).

fraud."  *Bank of Montreal* v. *Signet Bank,* 193 F.3d 818,827 (4th
Cir. 1999) (quoting *Allen Realty Corp.* v. *Holbert,* 318 S.E.3d
592, 597 (Va. 1984)).  "In all cases of fraud [under Virginia
law] the plaintiff must prove that it acted to its detriment in
actual and justifiable reliance on the defendant's
misrepresentation (or on the assumption that the concealed fact
does not exist)."  *Id.*

Thus, Plaintiffs must allege some form of injury that
resulted from them relying on Genzyme's alleged false statements
or concealment.  They do not do so.  The only information that
Plaintiffs can plausibly show Genzyme concealed was that the
Fabrazyme shortage would last longer than initially forecast.
As I observed earlier at footnote 14 in this Memorandum,
Plaintiffs say at paragraph 299 of the complaint that "[h]ad the
true information about the supply situation been provided to
[them] and their doctors, they would have acted with great
urgency in September, 2009 to seek alternative treatment, such
as Replagal®, through a compassionate use exemption or
additional Fabrazyme through private arrangements with other
patients and doctors."  SAC ¶299.  But Plaintiffs do not plead
with any particularity how they relied on Genzyme's statements
in deciding not to pursue alternative treatment, arrangements,
or a compassionate use exemption.  They do not allege, for

example, any communications involving their medical providers that they actually reconsidered due to Genzyme's statements.

## L.   *Breach of Fiduciary Duty*

The claims brought by Mr. LaForce and the Stanzianos for breach of fiduciary duty fail because they do not establish a fiduciary duty between Genzyme and customers taking Fabrazyme.

In Florida, "[c]ourts have found a fiduciary relation implied in law when 'confidence is reposed by one party and a trust accepted by the other.'" *Cap. Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994) (quoting *Dale* v. *Jennings*, 107 So. 175, 179 (Fla. 1925)). "A fiduciary relationship must be established by competent evidence, and the burden of proving such a relationship is on the party asserting it." *Orlinsky* v. *Patraka*, 971 So.2d 796, 800 (Fla. Dist. Ct. App. 2007). "[A] party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Orlinsky*, 971 So. at 800 (Fla. Dist. Ct. App. 2007) (quoting *Watkins* v. *NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. Dist. Ct. App. 1993)).

In Virginia, "there is a fiduciary relationship 'when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence.'"

78

*Allen Realty Corp.* v. *Holbert*, 318 S.E.2d 592, 595 (Va. 1984)
(quoting *H–B P'ship* v. *Wimmer*, 257 S.E.2d 770, 773 (Va. 1979)).
"[T]o establish breach of a fiduciary duty, a plaintiff must
show that (1) the defendant owed a fiduciary duty (2) the
defendant breached that duty and (3) damages resulted from the
breach." *Tech Sys., Inc.* v. *Pyles*, 630 F. App'x 184, 187 (4th
Cir. 2015) (per curiam).

Plaintiffs mention a few features of their relationship
with Genzyme to show the company owed them a fiduciary duty.
First, they say Genzyme "maintained and still maintains a close
personal relationship with Plaintiffs, including monitoring
their health both through individual case managers and through
the Fabry registry clinical trial." SAC at ¶474. Second,
"[w]hen a shortage of Fabrazyme was imminent, Genzyme undertook
to create a body of experts for reviewing the effectiveness and
safety of 'low-dose' Fabrazyme which included doctors and
employees of Genzyme." *Id.* at ¶475. Third, Genzyme "created
further fiduciary duties by affirmatively undertaking to
'protect the most vulnerable patients' who were the American
Fabry patients and then telling each individual plaintiff that
it would protect them even though Genzyme knew that Americans
did not have free-market access to Replagal." *Id.* at ¶477.

The relationship between Genzyme and Fabry patients may
appear closer than a standard relationship between a

79

**079**

manufacturer and a consumer, but I do not find that Florida or Virginia would recognize this to be a fiduciary relationship. The complaint does not say where the statements attributed to Genzyme about protecting vulnerable patients come from.  More importantly, patients still saw their own doctors and would necessarily have known they were dealing with a private company. As discussed above, Florida and Virginia both follow the doctrine of the learned intermediary.  The assumption in these states appears to be that a patient relies on her doctor when making medical decisions, not the manufacturer.

**M.   *Unjust Enrichment***

The unjust enrichment claims that Mr. LaForce and the Stanzianos bring against Genzyme also fail.

In Florida, the elements for an unjust enrichment action are: "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Agritrade, LP* v. *Quercia*, 253 So.3d 28, 33 (Fla. Dist. Ct. App. 2017) (quoting *Peoples Nat'l Bank of Com.* v. *First Union Nat'l Bank of Fla.*, 667 So.2d 876, 879 (Fla. Dist. Ct. App. 1996)).  "Equitable" is meant to reference the idea of fairness "and does not mandate that unjust enrichment be

80

construed as seeking only an equitable, as opposed to a legal, remedy." *Duty Free World, Inc.* v. *Miami Perfume Junction, Inc.*, 253 So.3d 689, 694 (Fla. Dist. Ct. App. 2018).

In Virginia, the elements of an unjust enrichment claim are: "(1) [the plaintiff] conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Schmidt* v. *Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). The doctrine "effects a 'contract implied in law' requiring one who accepts and receives goods, services, or money from another to make reasonable compensation for those services." *James G. Davis Constr. Corp.* v. *FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020). "Typical examples of unjust enrichment involve a payment or overpayment under a mistake of fact . . . or the acceptance of services without a contract for those services." *Id.* (internal citation omitted).

Mr. LaForce and the Stanzianos say this doctrine applies because "it would be unjust to allow Genzyme to retain the monies it charged" for low-dose Fabrazyme, when it knew the low doses sold were "ineffective and dangerous." SAC at ¶484. They say "[t]he scale and level of deception is so unconscionable that restitution to the individual Plaintiffs and disgorgement of the entire monies derived from the sale of 'low-dose' and

81

[v]esivirus contaminated Fabrazyme is required in equity." *Id.* at ¶485.

This argument is unpersuasive. As I discussed in relation to the financial standing issue, Plaintiffs have not shown that what they received from Genzyme was something of lesser value than what they intended to purchase or that they were operating "under a mistake of fact" as to what they would receive. *Cf. Hochendoner I*, 95 F. Supp. 3d at 32 (observing, in discussing an argument on warranties, "[a] shop owner does not warrant that one cup of sugar (the only cup in stock) will make as sweet a cake as the two cups of sugar for which the recipe calls"). Under the sensitization theory, Plaintiffs may have been harmed by the product, but that is an issue for tort law.

### *N.    Loss of Consortium*

Ms. Stanziano's loss of consortium claim fails because it is derivative of Mr. Stanziano's claims, which as indicated in this general discussion I will dismiss. *See Gates* v. *Foley*, 247 So.2d 40, 45 (Fla. 1971) (explaining that loss of consortium "is a derivative right and [wife] may recover only if her husband has a cause of action against the same defendant").

### VI. THIRD AMENDED COMPLAINT

Having found Plaintiffs' Second Amended Complaint inadequate, even incorporating the new information asserted in the proposed Third Amended Complaint, I will deny the request to

file a Third Amended Complaint because doing so would be futile in light of the shortcomings identified for dismissing the Second Amended Complaint.

### VII. CONCLUSION

For the reasons set forth above, Genzyme's Motion [ECF No. 102] to Dismiss is GRANTED with respect to all claims made by Plaintiffs.  All claims are dismissed without prejudice, except for the claims I address on the merits, which are claims asserted by Mr. LaForce, Mr. Stanziano, Ms. Stanziano, and Ms. Wilkins concerning harm they experienced due to sensitization to Fabrazyme.  I DENY as futile the Motion [ECF No. 105] to file a Third Amended Complaint.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TRINA WILKINS, JAMES BISHOP; LISA BISHOP;
AMBER BRITTON; TONI CORDOVA;
JOHN CORTINA; JILL CORTINA; GEORGE DEMKO;
DOVAN HELTON; MARY HELTON; NATE BROOKS;
SYDNEY JOHNSON; PLAINTIFF D.J.;
DAMON LAFORCE; MICHAEL MASULA;
ERIN MASULA; JAMES MATTHEWS;
THOMAS OLSZEWSKI; DARLENE COOKINGHAM;
THOMAS STANZIANO; WENDY STANZIANO;
EDDIE VIERS, individually as surviving spouse of
Teresa Viers, deceased, AND as Personal Representative
of the ESTATE OF TERESA VIERS; WILLIAM MCNEW;
JEANNE WALLACE individually as surviving spouse of
Joseph Wallace, deceased, AND as Personal Representative
of the ESTATE OF JOSEPH WALLACE; JAMES WALLACE;
and SAMUEL WALLACE,
         Plaintiffs,

                                  CIVIL ACTION NO.
    v.                         21-10023-DPW

GENZYME CORPORATION,
         Defendant.

## ORDER OF DISMISSAL

WOODLOCK, D.J.

In accordance with this Court's Memorandum and Order [ECF #117] issued on

September 14, 2022, granting the Defendant's Motion to Dismiss the Second Amended

Complaint, it is hereby ORDERED the above-entitled action be, and hereby is, DISMISSED in

its entirety.

                                    BY THE COURT,

                                    */s/ Barbara I. Beatty*
                                    ————————————

DATED:  September 14, 2022          Deputy Clerk

Case 1:13-cv-11336-DPW   Document 1-16   Filed 06/03/13   Page 1 of 3

SANOFI



Genzyme believes that developing life-saving therapies carries with it the responsibility to increase access to these treatments for patients, regardless of their location, financial situation, or other circumstances.

# Our Top Priority

All the work that goes into creating an effective therapeutic product means nothing if that treatment can't reach the patients who need it. But whether for financial, geographic, or logistical reasons, access to treatment remains an ongoing challenge for many patients around the world. That's why at Genzyme, our commitment to patients – and our efforts to ensure their access to our therapies – extend far beyond the lab and manufacturing plant.



## Committed to All Kinds of Patients

Genzyme was one of the first companies to develop therapies for ultra-rare diseases with fewer than 10,000 patients worldwide – demonstrating our commitment to creating treatment options for even the smallest patient groups.

Genzyme works with local governments around the world to secure timely approval of our products. While approvals are pending, we've helped patients with urgent medical needs obtain access to our therapies through compassionate use or expanded access programs. We work with national health services and private insurers to establish coverage for our products. And where coverage is not available, we work to facilitate free treatment access, help patients find alternative funding, and help countries establish sustainable health care systems. We also provide a range of educational and support services to raise disease awareness and advocate on behalf of patients' needs.

**Feature Story**



## Responding to Chile's 2010 Earthquake



In the wake of the 2010 Chilean earthquake, quick action by Genzyme's employees resulted in a resumption of treatment for local patients and a donation plan to build up important local health care capabilities.

**Read the full story**→



## Free Drug Programs

Recognized as one of the industry's most generous in-kind givers, Genzyme works with humanitarian organizations, local governments, and others to provide free treatment to hundreds of patients in need each year.

**More**→



## Supporting Healthcare Globally

Providing free medicines is only one aspect of improving access to treatment. Genzyme also participates in many activities to support sustainable health care systems and improve standards of care worldwide.

**More**→

# An Ongoing Commitment

In 2009 Genzyme faced a new challenge in access to treatment: difficulties with our Allston, Massachusetts, manufacturing plant resulted in a shortage of some of our enzyme replacement therapies. We quickly mobilized to begin remediating issues at the plant, working closely with regulatory authorities so normal production levels could ultimately be resumed.

To address periods of product shortage, we consulted with health care providers, patient groups, and other experts to help us establish guiding principles for the fair and ethical distribution of the limited

Case 1:13-cv-11336-DPW   Document 1-16   Filed 06/03/13   Page 3 of 3

supply. These principles include prioritizing treatment to the most vulnerable patients, regardless of their pay status or geographical location, and getting individual patients and physicians involved in decision-making for treatment allocations. Despite the hurdles we've confronted, Genzyme remains committed to serving and supporting these patient communities now and into the future.

For the latest updates on Cerezyme® (imiglucerase for injection) and Fabrazyme® (agalsidase beta), please visit the Genzyme Supply Update website. For information on Thyrogen® (thyrotropin alfa for injection), please view the latest communication.